## FLESNER v. COOPER.

No. 7783—Opinion Filed Jan. 23, 1917.

(162 Pac. 1112.)

1. Appeal —Law of Case—Error—Subsequent Appeals

Where, in a second appeal of the same cause to this court, the same questions are raised which have been presented upon the former appeals, the former decisions of this court in the same case are the law of the case, in so far as they are applicable.

2. Estoppel—"Equitable Estoppel" — Requisites—Concealment—Reliance.

The essential elements of an "equitable estoppel" are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment, mentioned, may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances. Case of Brusha et ux. v. Board of Education of Oklahoma City, 41 Okla. 595, 139 Pac. 298, L. R. A. 1916C, 233, distinguished.

3. Equity—Laches—Application.

When an action is not barred by the statute of limitations, the doctrine of laches does not apply where plaintiff does not ask for equitable relief, but only seeks to enforce a plain legal title in a court of law, except in so far as such laches may constitute an element of estoppel.

4. Trusts—"Resulting Trust"—Requisites.

A resulting trust arises by operation of law upon the intent of the parties, where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title; but the law will not operate upon an intent which involves a fraud upon a third person, or an illegality; and, where a disposition, conveyance, or transfer of real estate is made by general warranty deed, purporting to convey the entire title, it being the intention of the grantor thereby to create a secret trust, with the beneficial interest in himself, for the purpose of defrauding a third party by the appearance of record that the entire title is owned by the grantee, a resulting trust will not arise from such conveyance and intent, and the law will not disturb the legal title, but will leave the parties in the position in

which it finds them; and the grantee may set up such fraudulent intent in avoidance of an attempt by grantor to enforce such se͟c͟r͟e͟t trust.

5. New Trial—Newly͟ ͟n͟ ͟ General.—Motion—B͟r͟i͟e͟f, as to requisites of showing ͟o͟r͟d͟e͟r͟e͟d ͟E͟v͟i͟d͟e͟n͟c͟e.

Rule o͟f ͟m͟on for new trial on the ground i͟n ͟n͟e͟w͟ly discovered evidence, stated; and held, that motion for new trial in this case meets the rule, and new trial should have been granted.

(Syllabus by Johnson, C.)

Error from District Court, Payne County; A. H. Huston, Judge.

Suit by Lou Cooper against Gerd Flesner. Judgment for plaintiff, and defendant brings error. Cause reversed and remanded for a new trial.

Burdick & Wilcox, for plaintiff in error.

Opinion by JOHNSON, C. This is a suit between Lou Cooper, defendant in error, as plaintiff, against Gerd Flesner, plaintiff in error, as defendant, filed in the district court of Payne county upon July 25, 1905, for the recovery of an undivided one-half interest in 80 acres of land.

This is the third appeal to this court. See Cooper v. Flesner, 24 Okla. 47, 103 Pac. 1016, 23 L. R. A. (N. S.) 1180, 20 Ann. Cas. 29, and Flesner v. Cooper, 39 Okla. 133, 134 Pac. 379. While defendant in error has not filed a brief upon this appeal, on account of the long pendency of the litigation, we have examined with extreme care the entire record and authorities upon both sides of questions raised. Although we have reached the conclusion that the cause must be reversed on the ruling of the lower court upon a motion by defendant for a new trial on the ground of newly discovered evidence, in view of the important possibility that such action may tend to expedite the future termination of the litigation we conceive it to be the duty of this court to determine the law of the case, as presented upon this appeal, in so far as it has not been determined on the prior appeals.

The facts disclosed by the evidence, so far as material here, are as follows:

George W. Gardenhire homesteaded the land in question in 1889, obtaining final receipt from the government upon December 1, 1890 Upon March 2, 1891, George W. Gardenhire and wife executed to their son, Clyde Gardenhire, a general warranty deed to the land, for an expressed consideration of $1,500, though in fact there was no actual consideration therefor. Upon March 24, 1891,

Clyde G͟a͟r͟d͟e͟nhire and wife executed to William G. Scott a warranty deed purporting to convey the land; this deed also being without any actual consideration, but having an expressed consideration of $1,800. Neither Clyde Gardenhire nor Scott went into possession of the land, but continued to recognize George W. Gardenhire as the owner; the latter remaining in possession during their tenure of the legal title. There was evidence tending to show that George W. Gardenhire made and procured the execution and recording of these deeds for the purpose of creating the outward appearance that ownership of the land by an innocent third purchaser had intervened so as to eliminate the probability of contests of his entry of the land or action by the government to cancel the entry upon the ground that he (George W. Gardenhire) had entered the territory before the date of its opening to settlement, and his own consequent disqualification to make the entry of the land.

While the legal title stood in the name of Scott, a patent to the land was issued by the government upon February 18, 1892, in the name of George W. Gardenhire, as patentee.

In December, 1894, the courthouse and records of conveyances of real estate of Payne county were destroyed by fire.

Upon January 7, 1895, the said William G. Scott executed to George W. Gardenhire a warranty deed, for a purported consideration of $2,500, but with no actual consideration, purporting to reconvey the title to this land. During the latter part of the year 1899, the plaintiff in error purchased the land from George W. Gardenhire for a consideration of $3,500, $700 having been paid in cash and the balance in installments running through the course of several years, at the time receiving a bond for title. The deferred payments were completed and warranty deed delivered on May 16, 1901.

Jacob Gardenhire, a son of George W. Gardenhire, died intestate in the month of December, 1894, and shortly after the destruction of the county records, leaving as his sole heirs at law plaintiff, his widow, and George W. Gardenhire, his father.

At the trial, it was contended by plaintiff that, at some unknown and undisclosed date, prior to the burning of the county records and after the conveyance by Clyde Gardenhire to William G. Scott, Scott executed to Jacob Gardenhire a warranty deed to the land in question, which deed was contended by plaintiff to have been recorded upon the records of Payne county which were burned in December, 1894. By virtue of this deed,

the plaintiff claimed by inheritance from Jacob Gardenhire an undivided one-half interest in this land.

As above stated, Jacob Gardenhire died shortly after the destruction of the county records. George W. Gardenhire became insane shortly before the filing of this suit, and died a short time after the action was instituted and before the first trial. Scott testified that he did not receive or know of any consideration or reason for the execution by him of the deed to Jacob Gardenhire, and only remembered the fact of its execution by himself at the request of one of the interested parties. The death of Jacob Gardenhire and the insanity and death of his father, George W. Gardenhire, removed the only two witnesses who had personal knowledge of the reasons or intentions of the parties in the transaction, and resulted in the loss of all of the original deeds above mentioned as having been executed prior to the destruction of the county records. By mutual concession, secondary evidence was used at the trial to replace the lost original evidences of title.

The records of a local abstracter were introduced and showed the recording upon the burned records of all of the deeds in defendants' chain of title originating prior to the loss of the county records, including: (1) The deed from George W. Gardenhire to his son, Clyde; (2) and the deed from Clyde to William G. Scott (the deed from Scott back to George W. Gardenhire being shown by later county records). But the abstract records did not show the record of a deed from Scott to Jacob Gardenhire.

The deed from Scott to Jacob Gardenhire, and the fact of its having been recorded, were shown as follows, viz.: (1) By the testimony of Scott that he had executed such a deed; and (2) by the testimony of a woman neighbor to Jacob Gardenhire that, shortly before his death, Jacob had shown her an original warranty deed to this land, purporting to have been executed by Scott to him, and bearing an indorsement to the effect that it had been recorded.

It was conceded that George W. Gardenhire, the father of Jacob, was in possession of the land from time of entry, in 1889, till the year 1893, and from the death of Jacob, in December, 1894, till the sale and delivery of possession to defendant in 1899. Jacob Gardenhire farmed the land during the years of 1893 and 1894. The conditions of his possession were in controversy. Plaintiff was married to Jacob about three months before his death, and testified that her husband claimed to own the land, and exercised towards it the attitude and relations of an owner. One witness testified that he rented a part of the land from Jacob. Another witness testified that he rented a part of the land from Jacob, who signed the lease as his father's agent. Three sons of George W. Gardenhire, and brothers of Jacob, testified for the defendant. The brothers swore that during the years 1893 and 1894 Jacob rented the land from his father on shares, one of the brothers having been present at the execution of the contract; that Jacob at no time made any claim to the ownership of the land, but at all times recognized his father's ownership; that the father lived on the place with Jacob part of the time; that materials for repairs to the place were bought and paid for by the father; that Jacob paid rent to the father; and that they never heard of any supposed right of Jacob to the ownership of the land till the claim made by his widow long after his death. One of the brothers testified that there was an understanding between himself, the witness, the father, and Jacob, that while a minor Jacob had located upon a nearby piece of land; that Jacob relinquished this claim to witness, who was an adult and could perfect the homestead right; and that, when the homestead right to the other land should have been perfected in the then future, Jacob was to have that place and the land in controversy here was to be deeded to the witness; that the execution of this family agreement was in its incipiency at the time of Jacob's death; and that at that time it was still understood that Jacob had no title or claim to the land in controversy, but was the father's tenant. This bit of testimony seems to the writer to furnish the most reasonable explanation as to why the deed was procured from Scott to Jacob Gardenhire, and indicates that the father probably procured the deed solely for the purpose of getting the legal title back into the family for the purposes of complying with this agreement when it was completed; the actual ownership to remain in himself in the meanwhile. If this is true, Jacob could not have acquired the equitable title to this land from the transaction, particularly not until the perfection of the title to the land upon which he had made the invalid entry. However, the testimony upon this point is too vague to form the subject-matter of definite consideration.

To proceed with the facts, the testimony of the brothers showed that Jacob claimed no title to the land, and recognized the father as the owner and himself as the tenant; and

the brothers further testified that, after the death of Jacob, two of the brothers went to the place and finished shucking the corn made on the place, dividing the corn between the father, George W. Gardenhire, and the plaintiff, giving to the father the landlord's share under the rent contract above mentioned and giving to plaintiff the tenant's share; that plaintiff was present at this distribution; that the division was had as a matter of course, with the full consent and approval of plaintiff, and without any claim or suggestion by her to the contrary; that, after the death of Jacob, one of the other brothers rented the place from the father, the plaintiff living with him for a while, then going to Kansas for a while, then returning to that county and living for a summer with another brother near this land; and that during all of the above time the brothers knew of no claim of Jacob to the land, and the plaintiff at no time suggested any claim, but seemed at all times to recognize the title of their father.

The evidence showed that the father, George W. Gardenhire, remained in possession of the land, renting it out, from the death of his son in 1894, until the sale to Flesner in the latter part of 1899; there being no evidence of any claim by plaintiff to the land during that period. After the purchase by Flesner, he entered into possession, and through the course of years made improvements to the extent of some three thousand dollars, and finished paying George W. Gardenhire for the land, without any action being taken by plaintiff to establish any claim to the land until the bringing of this suit in July, 1905. Defendant testified that he never had any actual notice of any claim by plaintiff; that, during all of this time, plaintiff, who had remarried, lived within about a mile and one half of the land, passed the land frequently, and saw and talked to defendant frequently; and that, although plaintiff knew that defendant was paying for the land in installments and was making valuable improvements through the years, she never made any claim, or notified him of any claim she had to the land; and that no claim was asserted by plaintiff until this suit was brought, which was shortly after George W. Gardenhire, the only living witness at the time who knew all of the facts, had gone insane.

However, the plaintiff testified that, during the above period she saw defendant a number of times and informed him of her claim to the land. In addition to this, Louis Cooper and Malissa Cooper, the father and mother of plaintiffs, testified that, in January or February, 1900 (which was after Flesner had taken the bond for title and paid the part payment of $700, but before he had made other payments), Flesner and a companion driving through the country, stopped at their home and asked for dinner; that, while there, Flesner stated that he would probably buy the George W. Gardenhire land and would be a neighbor of the Coopers; that they told Flesner that he had better not buy this land, and stated to him the circumstances of the deed to Jacob Gardenhire and the claim of their daughter-in-law, and that if he bought this land he was buying a law-suit. The Coopers testified that Flesner's companion asked if there were children born to Jacob Gardenhire and wife, and, when told not, stated to Flesner that it was all right, that he could go ahead and buy the land, for under those circumstances Lou Cooper had no rights in the land. In his own testimony, Flesner admitted that he and the companion named were at the Cooper home at the time mentioned, and that he had told the Coopers that he had bought the George W. Gardenhire land and would probably be a neighbor of theirs. He denied that the Coopers had told him the details of plaintiff's claim, but swore that, when he told them he had bought the Gardenhire land, the Coopers told him that the land was in litigation; and, according to his own testimony, the statement by the Coopers that the land was in litigation was the end of the conversation with reference to the land, and, with this suggestion before him, he made no inquiry whatever of the Coopers of what was meant by their statement, although at the time he was talking to the people who later proved the most dangerous witnesses against his title, and to the man who knew the facts as to the claim that the deed had been made to Jacob Gardenhire, and who knew and could have told him that George W. Gardenhire was a sooner.

Upon this testimony, the defendant contended: (1) That, if the deed was executed by Scott to Jacob Gardenhire, it was not shown to have been recorded, and that he was an innocent purchaser; (2) that, if such deed was actually executed and recorded, the deed was without any consideration whatever, only operating to convey the bare legal title held by Scott, who, by virtue of the conveyances to him, was the trustee of a resulting trust in favor of George W. Gardenhire, and that Jacob Gardenhire would have taken the property subject to this trust; and (3) that, by her conduct, plaintiff was estopped to assert or recover any title which may have been conveyed by the deed to her husband and inherited by her.

Plaintiff controverted these contentions, and contended that no trust could have resulted from the conveyances, for the reason that such conveyances were made for the purpose of defrauding the government of the United States by concealing the right of the government to cancel the entry on the ground of the disqualification of George W. Gardenhire, as a "sooner," to hold the land, and that Flesner bought with knowledge of this situation, or with notice of facts which put him on inquiry and charged him with knowledge; and plaintiff further contended that she was not estopped, particularly on account of the fact that Flesner bought with knowledge of facts which put him on notice.

The case was submitted by the lower court to a jury, and a verdict was returned for plaintiff, which was sustained by the judgment of the lower court.

Plaintiff in error contends here: (1) That, under any theory of the evidence, he was entitled to judgment upon his plea of estoppel; (2) that, under every phase of the evidence, he was entitled to recover upon the theory of resulting trust; and (3) that the lower court erred in admitting and excluding evidence, and in instructing the jury, in reference to the questions of estoppel, laches, and and resulting trust.

In so far as the law involved in these contentions has not been settled by the decisions of this court on the former appeals of this case, above cited, a determination of the first two contentions made by plaintiff in error will determine the effect of the contentions as to error in the admission and exclusion of evidence, and in instructing the jury; and, in so far as the questions presented have been settled upon former appeals of this case, such former decisions of this court are the law of the case.

As to the contention that, by her conduct, plaintiff was estopped to assert title, the rule as approved by this court is:

" 'If a man is silent when he ought to speak, equity will debar him from speaking when conscience requires him to be silent.' * * * 'In order for the silence of a party to constitute an estoppel against him, it must have occurred under such circumstances as to have made it his imperative duty to speak, and the party in whose favor the estoppel is invoked must have been misled into doing that which he would not have done but for such silence.' " Heckman v. Davis, 56 Okla. 483, 155 Pac. 1170; Bragdon v. McShea, 26 Okla. 35, 107 Pac. 916

In Bragdon v. McShea, supra, this court outlined the essentials of an estoppel as follows:

"First, there must exist a false representation or concealment of material facts. Second, it must have been made with knowledge, actual or constructive, of the facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice."

The representation or concealment, mentioned in the last quotation, may arise from the silence when under imperative duty to speak, mentioned in the first quotation; and the intention that the representation or concealment of the party should be acted upon may be inferred from circumstances.

The essentials of estoppel, as above outlined, are not all present in this case; for it appears that the defendant was not without notice of the real facts. In a former appeal of this case, above cited, it was held by this court that, if the Jacob Gardenhire deed was recorded, the destruction of the record did not affect the notice imparted to the public by the destroyed record. There is evidence to show that the deed was recorded, and the jury specifically so found; this conclusion being sustained by the judgment of the lower court. Aside from the effect of this constructive notice, imparted by the destroyed record, it is in evidence that Flesner had notice of such facts as should have put him on inquiry. The plaintiff testified that she did not remain silent, but told Flesner a number of times of her claim. Louis Cooper and Malissa Cooper both swore that, at least before defendant had paid more than $700 on the land, if not before any payment was made, they told defendant of the situation. Defendant, in his own testimony, admitted a conversation with the Coopers, that the Coopers told him not to buy the land for it was in litigation, and admitted that he made no inquiry as to what they meant by this statement. A special finding of the jury was that Flesner had actual notice of the situation before he had paid more than $700 on the land. This finding is supported by the weight of the testimony; and, acting upon the record before us, we are bound to conclude that Flesner had knowledge of the claim of plaintiff, and is not in position to avail himself of equitable estoppel as against her.

As to the effect of the notice to Flesner of the claim of plaintiff upon his plea of estoppel, this case is distinguishable from the case of Brusha et ux. v. Board of Education of Oklahoma City, 41 Okla. 595, 139 Pac. 298, L. R. A. 1916C, 233, in that that case stated

an exception to the general rule; the exception being that, when property is taken for public use, in order to enable the taker to invoke the doctrine of estoppel against the owner, it is not necessary that the taker should have been acting in ignorance of the real condition of the title.

Plaintifff in error complains of the instructions of the lower court upon the question of laches. The court instructed the jury that, in the absence of facts constituting an estoppel of plaintiff to assert her claim and a bar of the claim by the statute of limitations, she would not be defeated by reason of any laches or failure to commence her action before she did commence it.

With reference to the availability of the plea of laches, as distinguished from estoppel, in a legal action, Cyc. lays down the rule as follows:

"Where an action is not barred by limitations, the doctrine of laches does not apply where plaintiff does not ask for equitable relief, but only seeks to enforce a plain legal title in a court of law." 15 Cyc. 78; McFarlane v. Grober, 70 Ark. 371, 69 S. W. 56, 91 Am. St. Rep. 84; Craig v. Conover (Ky.) 72 S. W. 2.

Plaintiff's action was in ejectment, for the enforcement of the plain legal title conveyed by the conveyance to Clyde Gardenhire, from him to Scott, and from Scott to her husband; and we are of the opinion that the staleness of the claim, or delay in bringing the action, could only be available for defense as an element of estoppel, or as a suspicious circumstance affecting the claim.

As to the proposition of resulting trust, in the former appeals of this case, cited above, this court has said what constitutes a resulting trust and how it may be established. Under these decisions and the evidence at the trial below, defendant probably would have been entitled to a directed verdict and to judgment upon the theory that Jacob Gardenhire was the successor of William G. Scott as the trustee of a resulting trust in favor of defendant as the successor of George W. Gardenhire, but for the evidence of the unlawful intent of the parties in making the conveyances from which the trust is alleged to have resulted. Defendant in error contended that these conveyances were made with the intention of thereby concealing the disqualification of the entryman and thus concealing the right of the government to a cancellation of the entry, in fraud of the government; and that this situation would defeat a resulting trust. Plaintiff in error contends that he is an innocent purchaser, without knowledge of the alleged fraud.

As state above, the weight of the evidence supports the finding of the lower court and jury that Flesner was not an innocent purchaser without notice of the fact of the Jacob Gardenhire claim, whatever such claim was. As to whether his information constituting such notice was sufficient to put him upon inquiry upon the point of fraudulent intent in the conveyances from which the purported trust may have resulted, this is rather a difficult conclusion to draw from the record before us. However, the verdict of the jury, and the judgment of the lower court, involved a finding against the defendant upon this point, which is probably supported by the weight of the evidence, and which we do not feel justified in disturbing, particularly in view of the fact that a reversal upon another point is considered necessary. The former decisions of this court in this case, supra, announced the rule as to what constitutes notice under such circumstances.

Plaintiff in error contends that the invalidity of a trust by reason of a wrongful or fraudulent intent can usually be raised only by some party who has been defrauded, and then only when he is not estopped, and cites in support of this contention 39 Cyc. 90, 91; but the authority cited does not sustain the contention. The general rule announced by Cyc. at the point referred to is:

"In general the validity of a trust may be questioned only by one who will be entitled to some interest in the property in case the trust is invalid, and then only when he is not estopped."

It can hardly be questioned that Lou Cooper will have an interest in the property in question in this case, if the trust be held invalid.

Another authority cited by plaintiff in error is the case of Miller v. Davis, 50 Mo. 572; but the ruling part of this decision reads as follows, to wit:

"It is a well settled principle of equity jurisprudence that in general, when one person pays the purchase money for land and the title is conveyed to another, a trust results in favor of the party who paid for the land. But where such purchase is made in fraud of an existing statute and in evasion of its express provisions, no trust can result in favor of the party who is guilty of the fraud. There is no pretense here that the plaintiffs are innocent purchasers. They make no such allegation in the petition. They occupy the precise relation to the defendant that was held by their assignor, and boldly assert that he, in order to obtain this tract of land from the United States, used the name of his infant son, because he could not make the entry

in his own name, having already entered as many 40-acre tracts as he was entitled to by the laws of the United States. His act in making this entry was against public policy. Under the facts as stated in the petition, no trust resulted to the father; and, as between him and his assignees and the son, a court of equity cannot disturb the title."

Under the title Equity, referring to the rule that, in such cases, equity will leave the guilty party seeking its aid where it finds him, Cyc. says:

"The rule not being for the benefit of defendant, it is unnecessary for its operation that plaintiff's misconduct should be directed against him. Relief is refused where a stranger is the sufferer from the misconduct, and although defendant is himself a guilty participant therein and may indirectly profit by the refusal of the court to act. Thus where property has been transferred in fraud of creditors the court will not at the suit of the grantor or his privies enforce a secret trust by compelling the fraudulent grantee to reconvey nor by requiring such grantee to account."

Equity will refuse relief to either party to an agreement tainted with illegality or fraud against a third person, where both parties are in pari delicto. It may be well, however, at this point, to say that the evidence nowhere shows that either Clyde Gardenhire, William G. Scott, or Jacob Gardenhire knew that George W. Gardenhire was a "sooner," or knew of or were parties to his fraudulent intentions in the conveyances to them.

If, for the purposes of this discussion, we waive the rule that equity will not take hold of a fraudulent transaction, we come under the influence of a correlative rule. Where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is inferred from the terms of the disposition, or from accompanying facts and circumstances, that the beneficial interest is not to go to or be enjoyed with the legal title, for the purpose of working out justice the law attaches to and operates upon the actual intent of the parties, enforcing such intent as the implied agreement of the parties. The resultant implied agreement, or trust, is the child of the law, and equity will support its existence and enforce its purposes. It seems but elementary to say that the law, in the exercise of its creative power, will not use the faulty material of fraudulent intent, or create a contractual structure which shelters its own masked enemy, fraud. Where the law does not attack, it will not consort with fraud, but will leave it alone.

If George W. Gardenhire made and procured the conveyances in question, conveying the legal estate to his property, with the unlawful or fraudulent intention of a secret trust being created in fraud of the government, and the lower court so found, and it is supported by the evidence, the law will not enforce the fraudulent or unlawful intention by creating a resulting trust, and consequently will not disturb the legal title. This conclusion hardly needs the citation of authority, but is supported by the Missouri case above cited.

After the verdict, and during the term, plaintiff in error, defendant below, filed in the lower court his motion for a new trial upon the ground of newly discovered evidence; and the exception to the order of the court denying this motion presents a more serious situation. The motion was in proper form, and as ground for new trial set up the following affidavits, among others, to wit:

"The State of Oklahoma, County of Payne,—ss.:

"J. J. Long, of lawful age, being first duly sworn, upon his oath deposes and says:

"My name is J. J. Long; I am 60 years of age; I am a resident of Payne county, Oklahoma, and have been a resident of said county for 24 years last past, except for about four years, some seventeen or eighteen years ago, when I was in the state of Iowa; and during the time of my residence in said county I have resided on my farm in said county, about five miles southwest of Stillwater, Oklahoma, being the southwest quarter (¼) of section N. 34, in township 19 north of range number two east in said county.

"I resided on said farm in the summer of 1895; in the month of June or July, 1895, I was at the home of G. W. Gardenhire on the old George Gardenhire place where the log house was, and where Gerd Flesner is now and has been residing since about the year 1900; I went there to see George Gardenhire about borrowing some money from him, having heard that he was pretty well fixed and might have some to loan. I can't fix exactly the day of the week or the month, but think it was some time between three and four o'clock p. m. and know it was in the afternoon. When I arrived there, I found G. W. (George) Gardenhire there and Lou Gardenhire, the widow of Jake Gardenhire, there, the same being now Lou Cooper, being the wife of Bob Cooper, whom she afterwards married. I was not successful in my mission, but stayed there for some little time talking about one thing and another with Mr. Gardenhire. I was quite well acquainted with him personally and had been so for years. He told me that the woman there was Jake Gardenhire's widow, and while I was there he showed me a paper which was printed and marked as a quitclaim deed from Lou Gardenhire to him, George W. Gardenhire. I did

not read the paper or deed over, but looked at it when it was shown me, and I remember that it was signed by Lou Gardenhire by her mark and had been acknowledged by her before some notary public or other officer having a seal, and I distinctly recollect that there was an impression of a seal on the paper. He told me in her presence that it was a quitclaim from her to him of that place, and she said to me in his presence that she had given him the quitclaim to the place not because she claimed the place or any interest in it, but because Mrs. Lahr was going to try to get her to beat him out of it, or had been trying to get her to claim some interest in it, or to claim the place and had been trying to get her to try to beat him out of the place or an interest in it. This as I recollect the conversation is about the way the matter was talked. He and I were old friends and were talking back and forth about our affairs and he showed me this deed, along with some other papers that he had there, but did not call my attention to any of them especially except this quitclaim deed I have mentioned, and I do not know what the others were, as they were not especially shown me. He was sitting there at the table, and either handed me or showed me the deed during the conversation, and I looked it over. I am not sure at this time whether he handed me the deed or simply placed it on the table, but I looked it over and saw it was a quitclaim deed from her to him, of that place.

"I did not tell Gerd Flesner or any of his friends, relatives or attorneys about this until March 18, 1915, as I did not want to get mixed up in the lawsuit between him and Mrs. Cooper, and while I knew the suit was going on I thought Mr. Flesner would win out all right and I did not want to mix up in the matter unless it seemed necessary to do so in order to save him from loss and to prevent the triumph of an injustice against him. I do not recollect of talking to any one about it until March 18, 1915, when I told Mr. Flesner; on that day I was talking with Mr. Flesner about the case, and he told me that the verdict went against him and then I told him, as I thought it was about time that I should break my long silence in regard to it.

"J. J. Long.

"Subscribed and sworn to before me this 19th day of March, 1915.

"Hays Hamilton, Notary Public.

"My commission expires March 9, 1918."

"The State of Oklahoma, County of Payne,—ss.:

"Gerd Flesner, of lawful age, being first duly sworn, upon his oath deposes and says:

"I am the defendant in the above entitled cause. While I have for many years heard rumors to the effect that Lou Cooper, the plaintiff, had at one time given a deed to George W. Gardenhire, from whom I purchased the 160 acres of land involved in suit in the district court of Payne county, Oklahoma, between me and her, I was never able, until March 18, 1915, to find any one who knew anything directly in regard to it. After the last trial I made a trip to Ft. Smith, Kansas, to see a person (Isaac Ridge) who I had heard knew something about it, but he said he knew nothing. There was no way for me to know that J. J. Long knew of it, and I had never been informed by any one that he did, and discovered that he did only by the merest accident and that only on March 18, 1915. There was no way in which, by any diligence of a reasonable kind, I could have discovered the existence of such evidence in the knowledge of Mr. Long before the trial and produced the same in court at that time or at any time prior to March 18, 1915.

"Some time just after the close of the last trial I had a conversation with A. C. Snowden, and at that time he told me, in substance, the things set forth in his affidavit hereto attached. I had no reason to think he knew anything about it, because I had learned that he was not in this country while Jake Gardenhire was living, nor for some time after his death, and it was only by the merest accident that I became informed that he knew anything that might benefit me in the case, and I could not have discovered the same before the trial and procured the same at the trial by the use of reasonable diligence.

"Gerd Flesner.

"Subscribed and sworn to before me this 19th day of March, 1915.

"Hays Hamilton, Notary Public.

"My commission expires March 9, 1918."

These affidavits were not controverted, and the motion was overruled.

At the time of the trial the principal witnesses to the transactions involved in this controversy had long been dead. The original muniments of title had been lost, and the public record of these instruments had been destroyed. Secondary evidence was necessarily resorted to by the parties to prove their claims of title, and the essential facts were established by extremely vague, secondary, and circumstantial evidence. The final proof of the rights of either party hung upon a bare thread of circumstance. Plaintiff's husband, Jacob Gardenshire, according to the weight of the evidence, made no outward claim to the title to the land during his lifetime. After his death, the plaintiff waited ten years, and until after the insanity of George W. Gardenhire, to assert rights in suit, during which time she endured the enjoyment by another of valuable income from property which she now claims all the time to have been her own. Her actions are a strong suspicious circumstance that she never had any actual right to the

property and had long since quitclaimed any shadow of claim she may have had. The affidavit of J. J. Long shows that, shortly after the death of her husband, she had executed a quitclaim to George W. Gardenhire, with the statement that a neighbor woman wanted her to try and beat the old man out of the property and that she executed the quitclaim to show that she had no right to the property.

The Long affidavit offers a reasonable explanation for a set of circumstances, which otherwise are not reasonably explained, and sets up proof of a distinct, independent fact, which was not in evidence at the trial.

The affidavits indicate that Long is an aged and respectable citizen of Payne county, that, until after the judgment in the last trial, he had not told any one of the facts sworn to by him in the affidavit for the reason that he had not wanted to get mixed up in the controversy between these parties, and had thought that Flesner would eventually win the litigation without his testimony; and that he finally told Flesner of the circumstances, feeling it his duty to prevent an injustice. Flesner's affidavit shows that, while, prior to the trial, he had heard rumors that Lou Cooper had at one time executed a quitclaim to Gardenhire, after diligent effort, making one trip to Ft. Smith, Kan. to try and run down the testimony, he had not been able to discover sufficient evidence to base a defense upon the rumor, and did not know of the testimony of Long, or have any means of knowing of it, until after the trial.

The requisites of a motion for a new trial upon the ground of newly discovered evidence have been stated by this court as follows, to wit:

"A rule of wide recognition regarding the granting of new trials on the ground of 'newly discovered evidence' exacts that the evidence fulfill the following requirements: (1) It must be such as will probably change the result if a new trial be granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial [with] due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be to merely impeach or contradict the former evidence." Vickers v. Phillip Carey Co., 49 Okla. 231, 151 Pac. 1023 L. R. A. 1916C, 1155.

With this rule in mind, the court has further said:

"A motion for new trial on the ground of newly discovered evidence should be sustained, when it appears that the evidence, if produced, would probably produce a different result." Roeser v. Pease, 37 Okla. 222, 131 Pac. 534; Burford v. Benton, 44 Okla. 283, 144 Pac. 349.

The motion for new trial, and affidavits, in this case, meet all of the above requirements. The Long affidavit, as we have said, offers a reasonable explanation of an otherwise rather unreasonable situation; and we have no doubt but that, if this evidence is produced at another trial, a different result will be had.

While it is to be regretted that this case, of such long pendency and so many trials, should have to be reversed, yet we are of the opinion that common justice entitles the defendant to present the Long testimony at a trial of his rights, and that an injustice was done him in the denial of a new trial for that purpose.

The cause should be reversed and remanded for a new trial.

By the Court: It is so ordered.