Benny DIXON, Appellee,

v.

Ken ROBERTS, Appellant.

No. 78180.

Court of Appeals of Oklahoma,
Division No. 1.

Feb. 2, 1993.
Rehearing Denied April 13, 1993.

Sam F. Houston, Marlow, for appellant.

Joseph A. McCormick, Tulsa, for appellee.

## MEMORANDUM OPINION

GARRETT, Judge:

Ken Roberts contracted with Steve Gross and Benny Dixon for the purchase and sale of adult ostriches and ostrich chicks.[1] Part of their agreement was apparently oral, and part was the subject of a written contract dated October 31, 1987. The written contract recited that Roberts was purchasing four adult ostriches from Gross and Dixon; and, as a part of the total purchase price, Roberts gave Gross and Dixon an option to purchase 20 ostrich chicks in 1988 for $750 each, and 20 more ostrich chicks in 1989 for the then "going market price". The adult ostrich part of the agreements was fully executed with the birds being delivered to Roberts, and the cash portion of the purchase price being paid. If and when the option or options were exercised, the chicks were to be delivered in pairs of one male and one female. At $750 each, 20 chicks would constitute 10 pairs at $1,500 per pair.

Roberts was in the business of breeding and raising ostriches for profit, and had some expertise in that area. Gross and Dixon had little, if any, experience or expertise in the ostrich business. They were amateurs or entrepreneurs who desired to become involved in this relatively new[2], and hopefully profitable field. As far as the record in this appeal is concerned, the purchase and sale to Roberts of the 4 adult ostriches was the only previous ostrich transaction or activity of Gross or Dixon.

Appellees attempted to exercise their option to buy chicks at $750.00 each in 1988, but Appellant did not deliver the chicks. This caused the parties to have conversations and negotiations with reference to performance of the agreement. In November, 1988, Gross sent a letter to Roberts. The letter was as follows:

Re: Ostrich Agreement Dated October 31, 1987

Ken,

I thought I should write this letter to summarize the last 2 phone conversations we've had about the above mentioned agreement to make sure we both have the same understanding about the present status of our agreement.

The following is what I understand the status of the agreement to be, as a result of those phone conversations.

—You intend to honor the agreement and fulfill your obligations covered in the agreement, with the 89' hatch.

—Our order will be one of the first orders you fill out of the 89' hatch, if not the first order filled.

—The only change in the agreement is that the 88' chick order will be filled out of the 89' hatch, with all other terms of the agreement remaining the same.

---

1. In this Opinion, Ken Roberts will be called Appellant or Roberts. Steve Gross and Benny Dixon will be called Appellees or (individually) Gross or Dixon.

2. Relatively new in the state of Oklahoma, and in the United States.

If the points covered above do not represent the present status of the agreement, let me know as soon as possible.

It was undisputed that Appellant received the letter, and that he did not respond or contact Appellees as to its terms.

In the Spring of 1989, Appellees attempted to secure delivery of 10 pair of chicks, at $1,500.00 per pair, to fulfill the 1988 order. Appellant had the chicks but he declined to sell at the rate of $1,500 per pair. He contended this 10 pair would be "1989" chicks and demanded the current market price.

■ This action for damages, resulting from an alleged breach of contract, was commenced by Dixon against Roberts. He alleged that Gross had assigned his interest in the contract to him. Gross filed no pleadings in the trial court. When the case was tried, both Dixon and Gross were treated as Plaintiffs. Judgment was entered for Dixon and Gross against Roberts. In this appeal both Dixon and Gross appear as Appellees. There was a stipulation in the pre-trial conference order, that "Plaintiff includes both Bennie Dixon and Steve Gross". If Gross were not a party, the stipulation could not be binding on him. However, Gross appeared at trial, testified as a witness, participated in the trial as if he were a party, and was represented by counsel. In this appeal, Gross appears as an Appellee and is represented by counsel. There is no contention that Gross is not a party. We treat the parties to be Dixon, Gross and Roberts in the same capacity as they were referred to by the trial court in entering judgment, and all of them are deemed to be parties to this appeal.

In the trial court the predominate issue became a determination of the date the contract was breached, and the proper measure of damages. A jury was waived and the case was tried to the Court. The parties stipulated in the pre-trial conference order that the market price for 8 week old ostrich chicks was $5,000 per pair in November, 1988, and $6,000 per pair in 1989. At the trial, some testimony indicated the market price in November, 1988, was $3,700. Appellant offered to make the sale at $1,000 off the $6,000 market price (to help them out a little), but refused to complete the transaction at the $1,500 per pair price. The Court found that a breach of contract occurred in 1989, when the market price of ostrich chicks was $6,000 per pair. Damages were calculated to be $4,500 per pair ($6,000 minus $1,500) for 10 pairs. Judgment for $45,000 was entered for Appellees against Appellant. The court found that neither Appellees' claim for additional and consequential damages, nor Appellant's claim for reduced or mitigated damages, was supported by sufficient evidence, and all such claims were denied. Neither party contends the court erred in this respect.

■ Since this is a law case, and is not equity, our standard of review as to factual matters is the "any competent evidence rule". Absent error of law, if there is any competent evidence to support the findings and judgment of the trial court, they will not be disturbed on appeal, even if the evidence would have supported a different result. *Tax Investments Concepts, Inc. v. McLaughlin*, 670 P.2d 981 (Okl.1982); *Maras v. Smith*, 420 P.2d 483 (Okl.1966); *American Fertilizer Specialists, Inc. v. Wood*, 635 P.2d 592 (Okl.1981); *Stovall v. Liberty Plan of American, Inc.*, 414 P.2d 242 (Okl.1966); *White v. McDonald*, 447 P.2d 746 (Okl.1968; and *Simons v. Brashears Transfer and Storage*, 344 P.2d 1107 (Okl.1959). An examination of the record reveals competent evidence, though conflicting, to support the Court's factual findings. Thus, we may only consider questions of law, and the possible effect of law questions on factual issues.

Appellant contends Appellees were informed of his inability to deliver any 1988 chicks in November, 1988, and therefore, that was when the breach occurred. In his brief, Appellant contends that since the market price of ostrich chicks was $2,000.00 to $3,000.00 a pair in November, 1988, the damages should be assessed using these figures. This would set the damages at $15,000.00, the difference between the contract price and the market value in November, 1988. Appellant relies on 12A

O.S.1991 § 2–713(1) which deals with a buyer's damages for non-delivery of goods. That statute hinges on when the Appellees learned of the breach. Here, evidence revealed that as late as November, 1988, there were ongoing negotiations between the parties, and they entered into an agreement regarding delivery of the 1988 chicks.

■ Appellant contends the November, 1988, letter did not change the contract because he did not sign it as required by the statute of frauds. He cites 12A O.S. 1991 § 2–201(1). However, while Appellant's answer generally pled the defense of the statute of frauds, among a general generic list of defenses, it was not otherwise argued in the trial court. It was not mentioned in his petition in error. The only justification for this Court to discuss any statute of frauds issue is that both parties argue it in their briefs. Injecting this issue into the case for the first time on appeal is an impermissable attempt to change the theory of the lawsuit. An Appellant may not change his theory of a case on appeal. *Mills v. Mills*, 512 P.2d 143 (Okl.1973), *Home–Stake Production Co. v. Minnis*, 443 P.2d 91 (Okl.1968), *Wickham v. Belveal*, 386 P.2d 315 (Okl.1963), *Maryland Casualty Co. v. Willsey*, 380 P.2d 254 (Okl. 1963), *Merkle v. Yarbrough*, 378 P.2d 333 (Okl.1963), and *Peevyhouse v. Garland Coal & Mining Co.*, 382 P.2d 109 (Okl. 1962).

■ However, Appellees contend, inter alia, they are merchants, and they fall within an exception to the statute of frauds. The exception is found in 12A O.S.1991 § 2–201(2). It states:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know of its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within 10 days after it is received.

12A O.S.1991 § 2–104(1) defines merchant as follows:

> "Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

The trial court found, and we agree, that the Appellees were not merchants, but were amateurs or entrepreneurs. This "merchant" argument lacks merit.

■ Appellees also contend, and we agree, that Appellant was equitably estopped from using the statute of frauds as a defense. The parties negotiated as to their obligations and rights resulting from Appellant's failure to deliver the chicks in the later part of 1988. The letter from Gross to Roberts resulted from those negotiations. Under the circumstances, Appellant was obligated to respond if he disagreed with the terms and conditions set out in that written communication. The letter was not a continuation of negotiations. It purported to state the terms of the modified contract. He did not respond. The doctrine of "estoppel by silence" applies.

■ In *Lacy v. Wozencraft*, 188 Okl. 19, 105 P.2d 781, 783 (1940), the court said:

> So-called promissory estoppel is recognized in many jurisdictions. See 19 Amer.Jur. 657. It is based upon the same equitable principles as is estoppel by silence. In the one case a promise is made with the intention that it be acted upon by the promisee; in the other, a person has been silent on some occasion when he should have spoken. But in either case the party who is estopped has in effect stood by and, in violation of his duty in equity and good conscience to warn another of the real facts, permitted the latter to take some action detrimental to his own interest.
>
> In order for estoppel to arise in such case, it is not necessary that the one estopped receive some benefit or consideration from the particular transaction; neither is it necessary that he be guilty of some actual overt act of fraud. It is

true that there must be some false representation or concealment of facts, and there must be an intention that some action be taken thereon, but the representation or concealment may arise from the silence of the party when he is under imperative duty to speak, and the intention aforesaid may be inferred from the circumstances. *Flesner v. Cooper*, 62 Okl. 263, 162 P. 1112. The rule is there stated as follows: "The essential elements of an 'equitable estoppel' are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment, mentioned, may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances."

And, 105 P.2d at page 784, the *Lacy* court said:

As said in the Johnston case [83 Okl. 285, 201 P. 654, 656], above: "The statute of frauds was never intended to be used as a shield or as a breastwork to aid any one in the perpetration of a wrong." To remain silent when one should speak constitutes a wrong in such case.

The November, 1988, letter, by its plain and simple language constituted a modification of the contract between Appellant and Appellees. In closing argument, Appellant agreed that the letter constituted a modification of the contract. It required the 1988 chicks to be delivered out of the first hatch of 1989. The contract remained the same in all other respects. Because the contract was modified, the breach did not occur until Spring, 1989, when Appellant failed to fulfill the 1988 order for 20 chicks out of the first 1989 hatch at a price of $750 each, or $1500 per pair.

Finally, Appellant contends that even if the November, 1988 letter was a modification of the original contract, the Court erroneously construed its terms because the modification created an ambiguity as to the price of the chicks to be sold. He says the original contract price was $1,500.00 per pair for 1988 chicks; and the contract price for chicks delivered in 1989 was $6,000 per pair, and these were 1989 chicks. Then he contends the ambiguity should be interpreted strongly against the party who caused the uncertainty to exist and the price should have been $6,000 per pair. He relies on 15 O.S.1991 § 170; and, *Stevenson Gas & Oil Co. v. Texam Oil Corp.*, 466 P.2d 950 (Okl.1970).

The Court rejected that argument and found the only possible interpretation of the modified contract to be that since Appellant did not deliver the chicks in 1988, as previously agreed, he would deliver those chicks in 1989, at the agreed 1988 price. In spite of his contentions and protests to the contrary, in the October 31, 1987 contract, both as originally executed and as modified by the November 1988 letter, Roberts guaranteed to sell the twenty 1988 chicks at the price of $750 each or $1,500 per pair, if the option to purchase was exercised. The modification of the contract changed the time of delivery. The price was not changed. In effect, in entering judgment, the court said it could not reasonably adopt Appellant's construction of the contract. We agree with the trial court. The correct measure or damages was applied.

AFFIRMED.

ADAMS, P.J., and JONES, J., concur.