FILED
United States Court of Appeals
Tenth Circuit

August 24, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ROCKWELL ACQUISITIONS, INC.,
an Oklahoma corporation,

Plaintiff-Appellant,

v.

ROSS DRESS FOR LESS, INC., a
Virginia corporation,

Defendant-Appellee.

Nos. 09-6065 and 09-6120[*]

(W.D. of Okla.)

(D.C. No. CV-08-146-F)

---

ORDER AND JUDGMENT[**]

---

Before **TYMKOVICH**, **SEYMOUR**, and **BALDOCK**, Circuit Judges.

---

Rockwell Acquisitions, Inc., an Oklahoma City shopping center owner,

appeals the district court's summary judgment in favor of one of its tenants, Ross

Dress for Less, Inc. The dispute concerns a provision of the lease between

Rockwell and Ross that requires certain anchor tenants to occupy the shopping

center and the definition of an anchor tenant. Ross alleges Rockwell violated the

---

[*] Case No. 09-6120 was submitted on the briefs by the court's Order, dated
May 4, 2010.

[**] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

required co-tenancy lease provision when it replaced an anchor tenant, Big Lots, with smaller retailers. As a result, Ross invoked a provision of the lease that allowed it to pay reduced rent because of the violation. Rockwell in turn claimed Ross violated the lease in doing so, and the dispute disrupted Rockwell's planned sale of the shopping center.

Rockwell sued Ross in Oklahoma state court, alleging breach of contract and tortious interference with Rockwell's contract to sell the shopping center to another developer. Ross removed the suit to the Western District of Oklahoma, and the district court granted summary judgment in favor of Ross. Rockwell now appeals the breach of contract and tortious interference rulings, as well as the assessment of attorneys' fees.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

*A. The Lease's Provisions*

In January 2005, Ross signed a 10-year lease for retail space with Rockwell.[1] The lease specifies two rents: (1) a "minimum rent" of $22,593.75 per month, and (2) a "substitute rent," defined as two percent of Ross's gross sales (assuming that is less than the "minimum rent").

---

[1] The lease executed in 2005 states the tenant's rent commences 120 days after the Intended Delivery date of January 9, 2006 (Section 1.4.1 of the Lease).

The lease also lists "Required Co-Tenants."  The focus of the parties'

dispute is the lease provision defining required co-tenancy, 1.7.1, that states:

> At least *all* of the *following three* (3) Co-Tenants [or other *comparable replacement Anchor Tenant* (as defined below) replacing one (1) or more of the named Co-Tenants ("Required Co-Tenants") occupying no less than ninety percent (90%) of the Required Leasable Floor Area of the Required Co-Tenant being replaced] occupying no less than Ninety-percent (90%) of the Required Leasable Floor Area indicated as follows:
>
> | Co-Tenant's Name | Required Leasable Floor Area (minimum sq. ft.) |
> | --- | --- |
> | (a) Target | 113,000 |
> | (b) Big Lots | 27,000 |
> | (c) PetsMart | 20,000 |
>
> An "*Anchor Tenant*" is a national retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75) stores.[2]

(emphasis added; brackets in original).  If the required co-tenants are not open

and operating during any portion of Ross's lease, Ross may be entitled to pay the

lower substitute rent.

The lease provides two primary reporting mechanisms by the landlord

concerning occupancy.  First, it requires Rockwell to provide to Ross a tenant

---

[2] Section 1.7.1 of the lease uses the singular term for an Anchor Tenant (R. Vol. 1, p.28) but Rockwell's Brief in Support of its Response to the Motion for Summary Judgment erroneously quoted Section 1.7.1 using the plural (R. Vol. 1, p.334) and mistakenly retained this line of thought in its arguments before the district court, which granted summary judgment favoring Ross.  Rockwell's appellate briefing correctly quotes the singular term of an Anchor Tenant (Aplt. Opening Brief, pp.4, 13) but pluralizes the term when combining two tenants as Anchor Tenants, avoiding defining each as an Anchor Tenant (*id.* at p.5).

roster and occupancy report annually, in January or February. Second, Section 6.1.3 of the lease states "Landlord shall promptly notify" Ross if the lease's occupancy conditions are not met.

*B. Big Lots Vacates, New Stores Move In*

In the fall of 2005, Big Lots—a required co-tenant in Ross's lease—informed Rockwell of its intent to terminate its lease due to financial difficulties. On January 31, 2007, Big Lots closed its store in the shopping center. Three weeks before Big Lots vacated the shopping center, Rockwell sent Ross the annual tenant roster, which showed Big Lots as a current tenant.

In early 2006—between the time Big Lots notified Rockwell of its intent to terminate the lease and the time Big Lots actually closed its store—Rockwell leased other space in the shopping center to Famous Footwear and K&G Men's Company.[3] Both Famous Footwear and K&G qualify as national or regional retailers under Ross's lease. *Combined*, Famous Footwear and K&G leased a space equivalent to 90 percent of the Big Lots store; *separately*, neither store occupied 90 percent of Big Lots's space. Famous Footwear and K&G began operating in late 2006, before Big Lots closed its store.

---

[3] Rockwell signed a lease with Famous Footwear in March 2006, then with K&G Men's Company in April 2006, and began collecting on its lease with Ross in June 2006, having received Big Lots's intention to end its lease back in the fall of 2005. Though this congregate of spring 2006 timing might beg the question of which of these three tenants might be considered a replacement, this issue was not briefed nor argued here.

After Big Lots closed its store, in June 2007, Rockwell leased part of Big Lots's former store to Harold's. Harold's occupied less than 90 percent of Big Lots's space, and Harold's did not qualify as a national or regional retailer.[4]

*C. Litigation*

Ross continued to pay minimum rent until December 2007. At that time, Rockwell asked Ross for an estoppel certificate waiving claims against Rockwell in preparation for the shopping center's sale. Shortly thereafter, Ross requested a tenant roster, and within weeks asserted it had overpaid rent because it should have been paying only the substitute rent from the time Big Lots closed its store in January 2007. Ross declined to execute the estoppel certificate, and after it began withholding rent to make up for the claimed overpayment, Rockwell sued.

In its suit, Rockwell alleged Ross breached its lease by refusing to pay the minimum rent, and Ross's withholding of rent tortiously interfered with Rockwell's sale of the shopping center. Ross moved for summary judgment, arguing the required co-tenancy provision of the lease unambiguously entitled it to pay the lower substitute rent because Rockwell had failed to replace Big Lots with an appropriate required co-tenant. The district court concluded the lease's co-tenancy provision required Rockwell to replace Big Lots with one comparable anchor tenant. Because Rockwell replaced Big Lots with two small tenants

---

[4] Prior to this appeal, Harold's filed for bankruptcy and vacated the shopping center.

instead of one large tenant, the co-tenancy requirement was not met, and Ross was entitled to pay the substitute rent.

The district court consequently granted summary judgment for Ross on both claims and awarded Ross attorneys' fees.

## II. Discussion

### A. *Standard of Review*

We review the district court's grant of summary judgment de novo. *City of Herriman v. Bell*, 590 F.3d 1176, 1180 (10th Cir. 2010). "Summary judgment is appropriate if there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law. We examine the factual record and draw all reasonable inferences in the light most favorable to the nonmoving party." *Id.* at 1181 (internal citation and punctuation omitted).

### B. *The Required Co-Tenancy Provision*

The crux of the appeal is whether the lease's required co-tenancy provision mandated that Rockwell replace Big Lots with a "comparable replacement Anchor Tenant" or allowed Rockwell to replace Big Lots with multiple, smaller tenants. This very narrow question turns on a careful parsing of the provision's text. "A lease is a contract and in construing a lease, the usual rules for the interpretation of contractual writings apply. Generally, the terms of the parties' contract, if unambiguous, clear, and consistent, are accepted in their plain and ordinary

-6-

sense . . . ." *Osprey L.L.C. v. Kelly-Moore Paint Co.*, 984 P.2d 194, 198 (Okla. 1999).

To satisfy the co-tenancy provision, Rockwell must fulfill two requirements: (1) all three of the "named" co-tenants—Target, Big Lots, and PetsMart—must be open and operating in the shopping center, and (2) the named co-tenants must occupy at least 90 percent of the specified floor area. If Rockwell does not fulfill these two requirements, it can still satisfy the co-tenancy provision by exercising the "comparable replacement Anchor Tenant" option. The anchor tenant option has three requirements: the tenant must (1) be "a national retailer with at least one hundred (100) stores or a regional retailer with at least seventy-five (75) stores," (2) "replac[e] one (1) or more of the named Co-Tenants," and (3) "occupy[] no less than ninety percent (90%) of the Required Leasable Floor Area of the Required Co-Tenant being replaced." Thus, for example, if a national retailer such as Kohl's replaced Target, it would have to occupy at least 90 percent of the 113,000 square feet designated to Target.

Despite the second requirement of the anchor tenant option—that an "Anchor Tenant . . . replac[e] one (1) or more of the named Co-Tenants"— Rockwell contends it was allowed to substitute *two* anchor tenants for one named co-tenant without at least one of the substitutes satisfying the 90 percent provision. Rockwell argues a separate provision in the lease, 26.7, modifies the

plain language of the required co-tenancy provision. Under the heading "Gender," 26.7 reads, in full:

> Words of gender used in this Lease shall be deemed to include other genders, and singular and plural words shall be deemed to include the other, as the context may require.

Rockwell reasons because singular and plural words may include each other, "Anchor Tenants" (plural) may substitute for "Anchor Tenant" (singular) in the required co-tenancy provision, and therefore the lease authorized its actions when it replaced Big Lots with Famous Footwear and K&G.

Rockwell's argument based on the lease's gender provision is unavailing. More specifically, the gender provision does not require singular and plural nouns to substitute for each other in the lease's entirety, but instead "as the *context* may require." (Emphasis added.) The required co-tenancy provision plainly allows a singular—one— anchor tenant to replace one or more required co-tenants. The provision's use of the singular when describing "Anchor Tenant" and a redundant use of plural when describing co-tenants ("one (1) or more of the named Co-Tenants") shows the provision's language is careful when describing numbers. We "will not create an ambiguity by using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on [a] provision." *Osprey*, 984 P.2d at 199. A context-specific admonition—buried in another part of the lease—to read the lease's gendered and numerated nouns liberally cannot overcome the unambiguous meaning of the required co-tenancy provision.

-8-

Rockwell's other textual arguments can be dispensed with briefly.  First, the co-tenancy provision requires "[a]t least all of the following (3) three Co-Tenants," be open and operating, and it lists Target, Big Lots, and PetSmart. Rockwell reasons that because the co-tenancy provision contemplates there could be more than three required co-tenants, numerous small anchor stores can replace a single named co-tenant.  This argument is meritless.  The number of required co-tenants is a question separate and apart from how many anchor tenants may replace each co-tenant—the latter is a textual question addressed to the anchor tenant option, discussed above.

Second, Rockwell argues an "anchor tenant" is not defined by leaseable floor space.  Therefore, it may replace a named co-tenant with tenants of any size so long as they meet the anchor tenant definition, i.e., they have the requisite number of stores regionally or nationwide.  Rockwell is correct in one sense: the co-tenancy provision does not define "anchor tenant" by square footage, instead relying on whether the tenant has a sufficiently large number of sister-stores in its chain.  If the co-tenancy provision allowed any anchor tenant to replace a named co-tenant, Rockwell would have a winning argument.  But the clause only allows replacement by an anchor tenant "occupying no less than ninety percent" of the named co-tenant's leasable space.  Put differently, anchor tenancy is a necessary but not sufficient condition to a store replacing a named co-tenant: *the store must also occupy the requisite leasable floor space of the departing tenant*.  Otherwise,

multiple qualifying Anchor Tenants could share limited space within a single store.

In sum, the lease's co-tenancy provision required Rockwell to replace Big Lots with one anchor tenant occupying at least 90 percent of Big Lots's space. Rockwell did not do so, and therefore it breached the lease agreement.

*C. Estoppel*

Rockwell argues even if it did violate the lease, Ross is estopped from enforcing the required co-tenancy provision because Ross knew of the violation yet remained silent for months. Oklahoma courts have developed a five-part test for equitable estoppel claims:

> The essential elements of an "equitable estoppel" are: First, there must be a false representation or concealment of facts. Second, it must have been made with knowledge, actual or constructive, of the real facts. Third, the party to whom it was made must have been without knowledge, or the means of knowledge, of the real facts. Fourth, it must have been made with the intention that it should be acted upon. Fifth, the party to whom it was made must have relied on or acted upon it to his prejudice. The representation or concealment, mentioned, may arise from silence of a party under imperative duty to speak; and the intention that the representation or concealment be acted upon may be inferred from circumstances.

*Dixon v. Roberts*, 853 P.2d 235, 239 (Okla. App. 1993) (quoting *Flesner v. Cooper*, 162 P. 1112, 1112 (Okla. 1917)).

The district court correctly held Ross was not estopped from enforcing the required co-tenancy provision. Rockwell's "estoppel by silence" argument fails, first, because Ross did not have a duty to alert Rockwell to the lease violation.

-10-

*See Sautbine v. Keeler*, 423 P.2d 447, 452 (Okla. 1966) ("To constitute estoppel by silence requires not only opportunity to speak, but also an obligation to speak."); *Dixon*, 853 P.2d at 238 (quoting *Lacy v. Wozencraft*, 105 P.2d 781, 783 (Okla. 1940)) (estoppel by silence occurs when "a person has been silent on some occasion when he should have spoken"). The lease places the duty to speak squarely on Rockwell, requiring Rockwell to "promptly notify" Ross if the occupancy requirements are not met. Even if we assume Ross knew of the lease violation prior to its withholding of rent, it did not have a "duty to speak" required under Oklahoma's estoppel law, nor was its knowledge a basis for acquiescence to the breach.

Second, even if Ross somehow had a "duty to speak," Rockwell's estoppel argument still fails because Rockwell was just as aware of the lease terms and relevant facts as Ross. Not only did Rockwell have actual knowledge and "means of knowledge" about the lease terms and Big Lots's vacancy, it had better knowledge of that information than Ross. Rockwell responds it was not aware of any lease violation because it did not believe the replacement tenants constituted a violation. Rockwell, in essence, argues that if it were wrong about interpreting the lease, it did not have the requisite knowledge of the legal controversy. Oklahoma's estoppel test, however, requires the party arguing for estoppel to lack "means of knowledge" about "real facts." Rockwell not only had the ability to know but actually did know the facts that constitute this legal dispute.

-11-

Rockwell points to *Bowen v. Freeark*, 370 P.2d 546 (Okla. 1962), in support of its estoppel argument. *See* Aplt. Br. at 27–30. *Bowen* involved a purchase option agreement between a lessor and lessees. If the lessor intended to sell the property, the agreement gave the lessees the right to purchase it from the lessor at the sale price within 10 days of the lessor's notice of intent to sell. *Bowen*, 370 P.2d at 548. When the lessor notified the lessees she wanted to sell the building, the lessees stated they did not want to purchase the building, and seven days later the lessor sold the building to a third party. *Five weeks after the sale*, the lessees attempted to exercise their purchase option. The Supreme Court of Oklahoma held in favor of the lessor, reasoning that the "plaintiff was in a position where he was faced with the duty of making known his rights under the option agreement or remaining silent." *Id.* at 550. The lessees remained silent and consequently were estopped from exercising their option.

*Bowen* is distinguishable for two reasons. First, while the party on which the contractual duty to speak rested, the lessor in *Bowen* who wanted to sell the property, actually spoke—Rockwell did not properly inform Ross as the contract required. After the *Bowen* lessor informed the lessees of her intent to sell, the lessees stated they did not want to exercise their option. Likewise, Rockwell could have informed Ross of the lease breach and Ross could have decided not to take action—but that did not happen here. Second, *Bowen*'s purchase option had a time limit: 10 days after the lessor notified the lessees, the lessees had to

exercise the purchase option or lose it. The lessees waited approximately 35 days to attempt to exercise their option. Even assuming—counterfactually— that Ross was notified by Rockwell about the lease violation, no such contractual time limit existed for Ross to act.

We affirm the district court's denial of equitable estoppel.

*D. Additional Discovery under Rule 56(f)*

Rockwell also argues the district court made reversible error by failing to grant it the opportunity to conduct additional discovery under Rule 56 of the Federal Rules of Civil Procedure. Rule 56(f) requires a party opposing summary judgment "by affidavit" to move the court for a continuance to allow additional discovery. FED. R. CIV. P. 56(f); *see also Been v. O.K. Indus.*, 495 F.3d 1217, 1235 (10th Cir. 2007) ("Rule 56(f)'s protection is not absolute, however, as its protection 'arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion.'"). Rockwell made its Rule 56(f) argument in a footnote in its district court response brief and never filed the requisite affidavit. Rockwell failed to comply with Rule 56(f), and the district court correctly denied Rockwell additional discovery.

*E. Tortious Interference with the Sale Contract; Attorneys' Fees*

Both Rockwell's tortious interference claim and its request for attorneys' fees are derivative of our primary rulings today. The district court was correct to deny Rockwell's tortious interference claim because Ross was justified in

asserting its rights in the lease.  The district court's award of attorneys' fees is affirmed because we affirm the district court's grant of summary judgment for Ross.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.

ENTERED FOR THE COURT

Timothy M. Tymkovich
Circuit Judge