594

Mayoe Porter BUSTER, Plaintiff,

v.

The PHILLIPS PETROLEUM COM-
PANY et al., Defendants.

H. C. HITCH, Jr., and Lala M. Hitch, his
wife, et al., Plaintiffs,

v.

The PHILLIPS PETROLEUM COMPANY
et al., Defendants.

Henry C. HITCH and Christine W. Hitch,
husband and wife, Plaintiffs,

v.

The PHILLIPS PETROLEUM COM-
PANY et al., Defendants.

The HITCH LAND AND CATTLE COM-
PANY, a corporation, Harry H. Hitch
and Bill Logsdon, Plaintiffs,

v.

The PHILLIPS PETROLEUM COMPANY
et al., Defendants.

Nos. 6015–C, 6016–C, 6017–C and 6018–C.

United States District Court
W. D. Oklahoma.

Sept. 7, 1955.

Tryon & Sweet, Guymon, Okl. and V.
P. Crowe and Wm. J. Holloway, Jr.,
Oklahoma City, Okl. (of firm Embry-
Crowe-Tolbert-Boxley & Johnson, Okla-
homa City, Okl.), for plaintiffs.

R. M. Williams, Bartlesville, Okl., and
Cecil C. Hamilton, Oklahoma City, Okl.,
for defendant.

VAUGHT, Chief Judge.

The above styled cases were filed in the district court of Texas county, Oklahoma, a restraining order was issued and a hearing set for September 14, 1953. On September 10, 1953 they were removed to this court on motion of the defendant, Phillips Petroleum Company, (hereinafter referred to as Phillips.) The cases were consolidated for trial and heard on September 7, 1954. At the conclusion of the testimony the court requested trial briefs from the parties, which have been filed. By common consent the restraining orders entered by the state court have remained in force, pending the final disposition of the cases.

The plaintiffs pray for an injunction to restrain Phillips from disconnecting their irrigation wells from the gas lines. The plaintiffs allege that, as owners of farm land including the mineral rights in Texas county, on which Phillips holds oil and gas leases and has had producing gas wells thereon for a number of years, and confronted with severe drought conditions, they investigated the possibilities of drilling irrigation wells and operating them by natural gas from under their lands. They further allege that the field superintendent in charge of the Phillips leases in that section either agreed with plaintiffs that gas would be furnished by Phillips upon the drilling of the irrigation wells, or consented to the connection of irrigation wells which plaintiffs had drilled under the belief that Phillips would furnish the gas.

Phillips' answer and counterclaim denied any agreement by it to furnish gas to plaintiffs; denied that any agent or employee was authorized to make any such agreement; and alleged that such agreements were in any event never reduced to writing and therefore were void under the statutes of Oklahoma. In its counterclaim it sought relief from plaintiffs enjoining them from taking gas from the wells involved.

The evidence offered will be considered with reference to each case.

Cause Number 6018

Robert Lee, a stockholder in the Hitch Land and Cattle Company, (hereinafter referred to as the Hitch Company) and a son-in-law of its president, George Hitch, testified that the Hitch Company and Harry H. Hitch, plaintiffs herein, owned the described lands involved, on which there was a producing gas well (Timmons) operated by Phillips. In the latter part of January, 1953, he and George Hitch went to the office of Dale Lewis, field superintendent of Phillips, to discuss the probability of securing gas for an irrigation well. Lee related the conversation and Lewis' statements as follows:

"A. (By the witness) We told him we contemplated drilling an irrigation well if gas would be made available to us; if the Phillips Petroleum Company would make gas available to us. He said they would; that several farmers there were using gas for irrigation and named several of them and said they would sell us gas, and that there would be a contract to be signed, that there would be no use to sign the contract until we drilled the well and see if we had water and if we didn't have water, there wouldn't be any use to sign the contract, and if we did we could negotiate a contract later. There would also be a meter to install at a cost of a $100.00. They didn't have a meter but while they would tie us onto the well, and would estimate the amount of gas used until we got a meter. Q. That occurred before you started an irrigation well? A. Yes, sir." (R. 14–15)

Lee further testified that he had known Lewis for several years and that he had a good many field men under his supervision, some of whom were on the company property on plaintiffs' land nearly every day; that at any time difficulties arose concerning gas lines, road maintenance or any other problems, they were taken up with Lewis. The irrigation well was drilled after the conversa-

tion with Lewis, approximately a half mile from the Timmons well and plaintiffs installed a connecting gas line over 3,000 feet in length. The well was about 400 feet deep, irrigated over 300 acres, and cost about $14,000 plus considerable other expenditures for additional equipment for irrigation farming. From the completion of the well in April, 1953 until the trial in September, 1954, plaintiffs had been using Phillips' gas. A payment was made on account about June 1, 1954 on the basis of the field price and accepted with the agreement that it was without prejudice to the rights of the parties in this action. No objection was made by Phillips to the use of gas for irrigation purposes until a letter, dated July 23, 1953, was received from an officer of Phillips advising that the plaintiffs' gas connection would be cut off unless severed by plaintiffs themselves.

Plaintiffs introduced a comparative statement prepared by Phillips for its proof on a motion to remand, showing the prohibitive cost of other fuel. The cost of using gas under plaintiffs' own land in an average year with continuous operation for 150 days, as calculated by Phillips, on the Timmons, Mayoe, Knott and Place wells, involved in these actions would be respectively $390, $425, $300, and $600. The cost of utility company gas would be well over twice as much as that under plaintiffs' lands purchased at the field price of 9.8262¢ per MCF, while the cost of propane, butane, diesel fuel and electricity is shown to range up to ten times the cost of their own natural gas.

Lee further testified that cost of conversion to diesel engines would be over $5,000 and that plaintiffs would not have drilled and equipped the well at a cost of $14,000 or more except for the assurance of Lewis concerning the availability of gas, and they therefore had the conference with Lewis before the money was spent. Particular details as to the volume of gas and time it was to be used were not discussed. With reference to Lewis' authority, Lee testified when asked if Lewis had negotiated a contract with anyone earlier: "Yes, he made the arrangements with the other farmers and had put in connections for the use of gas and we thought gas would be available to us." (R. 28) Lewis referred to a contract which plaintiffs would sign after being tied on but did not say whether he would be the one to execute it. They had never been offered a written contract, while being willing and able to pay the field price for the gas used.

George Hitch testified that he had lived in Texas county for 66 years during which time he had done stock raising and farming. Irrigation had been practiced there for five to ten years. His testimony corroborated that of Lee as to the conversation they had with Lewis; their reliance upon the representations of Lewis for proceeding to drill the well and the installation of a meter at the expense of plaintiffs; the subsequent payment for gas used until June 1, 1954; and that Lewis never advised them the contract would have to be made through the Bartlesville office of Phillips. He further testified that the connection at the well was not made or paid for by plaintiffs.

Plaintiff Bill Logsdon testified that he had farmed the land involved here as a tenant since 1944; that the irrigation well was about 360 feet deep and was equipped with an eight-inch pump, sixteen-inch perforated casing and gas motor; that the land had to be leveled and he had to purchase special equipment for irrigation farming costing about $15,000, which was done after the arrangement was made by Lee and Hitch with Lewis. In addition to the work done on the well and the land, he dug a trench about two feet wide and thirty-five feet long and a one-inch line was laid to the gas well. The digging of the well and the laying of the pipe were observed by Phillips' employees on the premises.

### Cause Number 6015

Mayoe Porter Buster, plaintiff, testified that she and her husband, Robert

W. Buster, owned as tenants in common the described lands involved on which Phillips operated the Mayoe well. They decided to drill an irrigation well thereon in the Fall of 1952. Dale Lewis came to the Buster home in the latter part of December, 1952, or the first part of January, 1953, and discussed the matter of supplying the gas. Lewis stated in substance: "Go right ahead and complete your well. There is a valve that will have to be changed. We will change the valve and whenever you get ready, complete your well, in order to hook onto the gas, give us a ring and we will hook onto you." (R. 69) The well was completed following this conversation and the gas connection was made. Later they signed a contract and gave a $100 check to cover cost of installation of a meter, but Lewis returned the check stating that the matter had been taken out of his hands and that he could not go ahead and make the contract. This conversation was sometime in May, 1953. The letter of Phillips announcing the cutoff of plaintiff's gas was received about July 24, 1953. The irrigation well and large reservoir tank had cost approximately $17,000, which expenditure was made in reliance on Lewis' representations as to the availability of gas.

Robert W. Buster testified that he had engaged in dry land and irrigation farming most of his life. He corroborated the testimony of Mrs. Buster as to the drilling of the irrigation well; the conversation with Lewis; the expenditures as to the drilling of the well and the additional equipment, made in reliance upon Lewis' representations; and that they had never heard of any deviation by Phillips from the general practice and policy permitting royalty owners to use gas from their own land for irrigation. He further testified that Lewis announced the change of policy and that "his authority had been taken away from him to do that," this authority being described as his power "to issue the contract to us."

The Busters testified that Lewis did not state in his first conversation that any contract would have to be approved in Bartlesville, and mentioned this only when he brought the form of contract. This contract had certain objectionable limitations and they referred it to their attorney. When these limitations were discussed with Lewis, he warned that Phillips was cutting off gas users in Texas and they had better go ahead and sign. Under this compulsion the Busters signed the contract which Phillips rejected. The Busters made payment to Phillips of $375.40 to cover gas used by them based on the field price, with the understanding of a reservation of rights to the parties in this action. Buster testified that a change to a diesel engine would cost about $5,000; the cost of gasoline would be "enormous;" butane would cost more than ten times as much as natural gas; and electric facilities were not immediately available.

### Cause Number 6017

Henry C. Hitch, Sr., plaintiff, testified that he had lived in Texas county seventy years, engaging in wheat and cattle raising; he and his wife own certain described land on which the Place well is operated by Phillips; and an irrigation well had been drilled four or five years ago by his son on nearby land on the Phillips Hitch-O lease and gas was used to power this well. Drilling of the two irrigation wells involved here (at a cost of $15,000 each and a further expenditure of $15,000 for leveling the land), was done in reliance upon the general custom and policy of Phillips to permit use of gas for irrigation purposes. The connection for the use of gas from plaintiffs' land was with the knowledge of the employees of Phillips who are on plaintiffs' farm every day. The first information concerning the change of policy and the intention of Phillips to cut off the supply of gas was their letter of July, 1953. Hitch testified further that in his opinion farm land such as his could not be operated profitably with any other fuel than natural gas for irrigation power; that he knew of other farmers who were using the gas; that Phillips had given a writ-

ten contract for the use of gas on the Hitch-O lease; and that he knew of no prior instance where Phillips had denied the use of gas to landowners.

### Cause Number 6016

H. C. Hitch, Jr., plaintiff, testified that five irrigation wells had been drilled on land owned by the Hitches where Phillips had leases, all of which irrigation wells are powered by gas. Prior to drilling the first well in 1950 on the Hitch-O lease he discussed the matter with George Allison, area superintendent for Phillips, who stated that gas would be available and they should proceed. The gas connections were made, the gas was used for several months when a contract was given plaintiffs and a meter installed.

Relying upon the general practice and policy of Phillips and other producers in the area of furnishing gas for the operation of the irrigation wells, the irrigation well involved here was drilled in the Spring of 1953 on the Knott lease, at a total investment of approximately $25,000 covering the cost of drilling, preparation of the land and purchase of additional equipment. Hitch further testified that employees of Phillips were on the property every day, checking the gas well, and that the circumstances of connecting the gas line, which took several days, were such that Phillips had notice of the connection. From his experience as a student at Oklahoma A. & M. College and his lifetime in actual farming, in his opinion irrigation farming would not be profitable if natural gas could not be used for operation of the pump and that the Phillips dealer advised him other fuels would cost from ten to twenty times as much as gas.

The testimony on behalf of the defendant follows.

R. B. Stewart, assistant manager of the natural gas department of Phillips, described the origin of the contracts for sale of gas for use on irrigation wells, and the fact that a total of eight agreements had been entered into with termination rights. He testified that any instructions concerning the contracts that were given to plaintiffs in these four cases were given by Lewis, and the company did not itself from Bartlesville advise the Hitches. The field representative was given form contracts and instructed that if any royalty owners wanted gas for irrigation purposes they should be given one of these forms to sign and it would be sent to the Bartlesville office for consideration. The reasons for denying gas to plaintiffs were contractual commitments made earlier to pipeline purchasers and requirements for Phillips' manufacturing operations. He admitted that only a small percent of gas produced was used by these irrigation wells; that no landowner in Texas county had been denied the use of gas from under his land until 1953; that Panhandle Eastern Pipe Line Company, the purchaser of gas from Phillips, had made no complaint about the use of the irrigation gas by the landowners. He further stated that Phillips would not negotiate with any of the plaintiffs on any of the details of the contract: price, volume, or any matter, and concluded: "We are just not going to sell any gas for irrigation purposes out there." (R. 175)

W. S. Etchitson, district superintendent of the Panhandle district, testified that Dale Lewis, as superintendent for the Hansford area working under his supervision, had authority to issue contracts, which when signed by the landowners, were submitted through Etchitson to Bartlesville for approval. He gave no authority to his field men to negotiate contracts, and the only man for the landowners to contact in connection with the use of gas in Texas county was Dale Lewis.

Dale Lewis testified that he did not negotiate contracts for furnishing of gas for irrigation purposes, but that he submitted contracts to those wanting gas, stating that they knew he had no authority to sign the contract. He admitted a conversation with Robert Lee and George Hitch occurred after the first

of the year 1953 concerning the Timmons well involved in Cause Number 6018, when he advised them that Phillips had other contracts in the area and that he felt certain that they probably could get a contract for use of the gas, but that there was a form contract that must be signed in order to get the gas. His recollection was that Lee had said that if he decided to drill the well he would come back to see Lewis later.

He also testified with reference to Cause Number 6015 that the first meeting with the Busters was probably in March, 1953, when he presented a form contract for their approval; this was after the completion of their irrigation well and the commencement of use of gas. Shortly thereafter Buster expressed dissatisfaction with limitations in the contract on volume and possible cancellation, and he advised them that he had no authority to change the content of a contract; later he told them that he had heard rumors that Phillips was canceling the use of gas and urged that they sign the contract and pay the $100 for the meter, which they did. He denied that he advised the Busters that they could have gas without a written agreement and approval by the company at Bartlesville.

He further testified that the first time he learned of irrigation gas being used on the Knott and the Place leases, involved in Causes Number 6016 and Number 6017, was during the running of a survey in about March, 1953, but that he did not know whether his field men knew earlier of the use of gas there. He admitted that he had authorized installation of the valve nipple on the Timmons well (Number 6018) and on the Mayoe well (Number 6015), but denied authorization of the installation of irrigation fuel lines to the valves. He admitted that as area superintendent for about three and a half years, his duty included contacts with landowners concerning their field problems; that he was the proper man to be contacted on these field matters and that he had discussed these matters with all the plaintiffs at one time or another.

With reference to the conversation between Hitch, Lee and Lewis, the preponderance of the evidence is that such a conversation did take place and that Hitch and Lee advised Lewis they were contemplating drilling wells for irrigation purposes but would not go to that expense unless they were assured Phillips would furnish gas for the operation of the pumps; that Lewis told them to go ahead and drill the wells and if they got water then they could make a contract for the use of gas, but at no time in that conversation did Lewis indicate that they would not furnish the gas, or upon any specific conditions. The court is of the opinion that the expenses for these two wells, in excess of $50,000, were incurred on the representation of Lewis that gas would be provided, and Lee and Hitch had a right to assume that the gas would be provided at the field price.

With reference to the conversation between Lewis and the Busters, the evidence of the Busters was positive that the first conversation was had in the latter part of December, 1952, or early part of January, 1953, when they advised Lewis that they were contemplating drilling a well for irrigation purposes but would not do so unless they were assured that they would have gas to operate their pump. The preponderance of the evidence is that Lewis told them to go ahead and drill the well and if they found water, Phillips would make a contract with them for the use of gas. The Busters testified that later, after the wells were finished and the connections were made, Lewis did furnish a contract but this contract provided that defendant could eliminate the supply of gas on notice. This was not satisfactory to the Busters and they declined to sign the contract. They took the matter up with their attorney and Lewis later advised him that his authority had been withdrawn and that the contract would have to be approved at the Bartlesville office.

In the other cases involved, while there was no direct assurance by Lewis to the landowners that gas would be furnished, yet there was no indication on the part of Lewis that a sufficient supply of gas to operate their irrigation wells would not be furnished to all of the farmers on whose lands Phillips had leases.

One of the contentions of the defense is that Lewis had no authority to make these agreements to provide gas for irrigation purposes, yet Lewis was in complete charge of the operations of Phillips in that territory and it was admitted by the officers of the corporation that any matter affecting operations in that territory would have to be taken up first with Lewis.

After these irrigation wells were completed the connections were made by the representatives of Phillips or with their knowledge and consent. Lewis' testimony was that he did not know the connections had been made, but the testimony of other witnesses contradicts this statement, and it is apparent to the court that these connections were made with the knowledge and consent of those in charge of the operations in that territory.

The contracts which were submitted, and which Phillips contends were the only contracts that would be binding, provided that the gas could be disconnected after one year on thirty days notice. This would be an arbitrary provision of the contract and would clearly be inconsistent with the agreement made by Lewis. Certainly a farmer would not be inclined to drill a well at a cost of $15,000, supply the necessary equipment for operation thereof, and condition the surface of the land so that it could be properly irrigated, if he were faced by a provision in the contract which would deprive him of the use of the gas after one year on thirty days notice. It was the custom in that territory to provide gas for irrigation purposes from gas wells on the landowner's property, and all the other companies except Phillips recognized that custom and practice. It is apparent that the expenses would not have been incurred for drilling and equipping the wells and preparing the lands for irrigation had it not been for the specific representations made by the representatives of Phillips who were actually in charge of the operations in that territory.

The principal contention of Phillips is that its previous contractual commitments to pipelines required all of the gas supplied from these wells. However, the record discloses that the pipeline purchaser under these alleged contracts made no objection to the use of gas for irrigation purposes, and the total amount of gas used for irrigation purposes did not exceed three percent of the total amount produced.

The testimony of R. B. Stewart, assistant manager of Phillips' natural gas department, was that the production per year on each of the wells involved here was: 106 MCF on the Mayoe; 106 MCF on the Knott; 52 MCF on the Place; and 92 MCF on the Timmons, or that the four wells produced in excess of 346 MCF per year. Quoting from the testimony of this witness:

"Q. So the total amount of gas that would be used by the lessors would be approximately three percent of the production of the well. A. In that particular instance, yes, sir. There are cases I think where the people have wanted to drill several irrigation wells and attach to one gas well." (R. 170)

"Q. You are not contending what these four farmers use for irrigation purposes is cutting down the supply you have to supply the Panhandle with, do you? A. To the extent that the Panhandle is making any complaint, no, because the amount of gas used by these four wells is *an insignificant amount of gas,* but I want to make one point clear and that is, we have tried to accommodate all that we felt we could until the time has come now, where there is evidence that there is going to be a tremendous demand for this thing and if we continue

to let one royalty owner have gas for irrigating his lands, we feel we will be in a worse position than we are in denying that one, and they would probably accuse us of discrimination.

"Q. Don't you recognize a distinction between a man who has spent $15,000 or $20,000 in drilling a well relying on the fact that he would have a right to use natural gas from the man who knows in advance he can't get it and spends no money in drilling a well upon that assurance? A. Well, I don't think it would stop here. That is the company's difficulty. We don't know that someone might drill a well and get it to our lines, and say they relied on the fact we served people in the past. We have got to draw the line somewhere." (R. 168–169) (Emphasis supplied.)

The record discloses the comparative cost of available fuels for operation of these irrigation wells per year to be: $390 to $600 for Phillips gas; $885 to $1,770 for West Texas Gas Company gas; $3,030 to $6,060 for propane and butane; $5,050 to $10,100 for gasoline; $2,270 to $4,540 for diesel; and $2,010 to $4,020 for electricity.

Summarized, Phillips' contentions are: First, that the alleged oral contracts are invalid for the reasons that they are violative of the statute of frauds; Second, that Dale Lewis had no authority or power to make the alleged oral contracts; and, Third, that since Phillips had entered into a contract to sell the entire production from its gas wells in Texas county, that it could not consistently supply gas for irrigation purposes.

The plaintiffs contend, however, that oral contracts, under such circumstances as surround the transactions involved in the cases at bar, have been approved by the Supreme Court of Oklahoma in Lacy v. Wozencraft, 188 Okl. 19, 105 P.2d 781, and Flesner v. Cooper, 62 Okl. 263, 162 P. 1112. They also cite Restatement of Contracts, Section 90, and Wolfe v. Wallingford Bank & Trust Company, 124 Conn. 507, 1 A.2d 146, 117 A.L.R. 932. Plaintiffs conclude that under the law discussed in the above authorities, the doctrines of promissory estoppel and equitable estoppel apply and they are entitled to relief against the threatened action of Phillips to cut off their gas supply.

As to whether Lewis had authority to bind his company in the alleged oral contracts, all the circumstances surrounding the transactions must be taken into consideration. These irrigation wells are on the farms owned by plaintiffs, on which Phillips holds mineral leases. For the past five years at least gas has been furnished plaintiffs and others for irrigation purposes with the full consent of Phillips. The custom of providing gas from one's own farm for irrigation purposes was recognized and followed by all the gas companies operating in that area. Lewis was the superintendent in charge of the operations of Phillips in Texas county, and any problems concerning same in which the farmers were interested were to be taken up with Lewis. Insofar as these farmers were concerned, in all matters with Phillips, Lewis was recognized as Phillips. Lee, Hitch and the Busters discussed their proposed drilling of irrigation wells with Lewis, and while Lewis stated that later written contracts would be provided, he did tell these plaintiffs that they should "go ahead" and drill the wells and that gas would be furnished. Nothing was even intimated that the proposed written contracts would include a provision for only one year's supply of gas and that the contract could be terminated by giving thirty days notice. The gist of the oral contract was "you dig your wells, we'll furnish the gas."

It was well known to Lewis that the drilling of a well, providing equipment and preparation of the land for irrigation would necessitate expenditures on each farm of appproximately $25,000.

It was also well known to Lewis that unless the farmers could secure gas, this enormous expense would not be incurred.

Lewis was held out by Phillips as being its spokesman in Texas county and his conduct indicated his authority. Lewis' statement to the Busters, that the authority to make contracts had "been taken out of his hands," bears the strong inference that this authority *had been in his hands*, but had now been terminated. If this be true then months before when the alleged oral contracts were made, Lewis actually had the power to make the contracts.

Not until the July 23, 1953 letter from Bartlesville did any of the plaintiffs suspect that the supply of gas would be arbitrarily terminated.

The third contention that the sale of the entire production was covered by contract to the pipeline company, in view of the testimony of Phillips' own witness, is without merit.

A further contention of Phillips, and which is apparently the real reason for terminating its willingness to supply gas for irrigation, is that Phillips simply changed its policy with reference to sale of gas for irrigation purposes.

An examination of the authorities cited by Phillips in its brief has been made, but the court is convinced that an equitable consideration of all the facts and circumstances justifies the conclusion that plaintiffs are entitled to the relief sought, and a permanent injunction will issue in accordance with plaintiffs' prayer.

Since the filing of this suit and even since its trial, the Oklahoma Legislature has passed an Act which by its terms would make an injunction unnecessary, however, this Act has not been considered in deciding the issues in these cases.

Findings of fact and conclusions of law, consistent with this opinion, may be submitted by plaintiffs' attorneys within fifteen days of this date.