Augusta S. SISLER, Executrix of the Estate of Wade Sisler, Deceased, and Wade Sisler, d/b/a Mercy Hospital, Plaintiff in Error,

v.

Ellen JACKSON, Defendant in Error.

No. 42034.

Supreme Court of Oklahoma.

July 8, 1969.

As Corrected Nov. 10, 1969.

Rehearing Denied Nov. 12, 1969.

Farmer, Woolsey, Flippo & Bailey, Tulsa, for plaintiff in error.

Paul W. Brightmire, Tulsa, for defendant in error.

BERRY, Vice Chief Justice.

This medical malpractice case has a lengthy history. Plaintiff in error, a medical doctor specializing in orthopedic surgery, owned and operated his own hospital. Following surgery and hospitalization in August 1959 Ellen Jackson, then 47 years of age and earning her livelihood as a waitress, suffered a permanent impairment of "dropped" right foot. In July 1961 she filed suit to recover damages against both defendant and the hospital alleging four separate causes of action: (1) gross and wanton carelessness and negligence of defendants in numerous respects; (2) defendants' breach of both express and implied warranties; (3) fraudulent and deceitful concealment of true facts as to plaintiff's condition and misrepresentations of defendant; (4) assault and batteries above and beyond consent and authority given defendants to perform certain surgical procedures. After the issues were formed the case was presented to a jury.

Upon completion of plaintiff's case and announcement of rest defendants demurred to the evidence. Following argument the trial court sustained demurrers as to the last three causes of action, and allowed plaintiff to reopen the case in order to introduce additional evidence supporting the first cause of action. Plaintiff then dismissed the action without prejudice to refiling. Upon defendant's inquiry whether dismissal was proper under such circumstances the court stated plaintiff had been given permission to reopen, and was of the further opinion plaintiff properly could dismiss.

Plaintiff immediately filed another action charging defendant with: (1) negligence involving lack of skill and care; (2) assault and battery arising from uninformed consent, amounting to no consent at all, causing injury; (3) breach of warranty that nothing could go wrong and plaintiff would be all right after surgery; (4) fraudulent concealment of injury resulting in aggravating delay of proper expert treatment; (5) assault and battery from defendants allowing unlicensed negro porter to practice medicine on plaintiff causing injury.

Prior to trial the first cause of action was amended to allege defendant's failure to advise plaintiff surgery possibly might result in a partially paralyzed leg, and plaintiff's consent therefore was without sufficient knowledge and not real. At a prior hearing the court had sustained defendant's motion to require election, and plaintiff elected to proceed upon the first and third causes of action. The amendment was permitted only as an additional ground of negligence, any theory of respondeat superior expressly being ruled out.

A voluminous record precludes concise summation. Effort is directed only to narration of factual background leading to plaintiff's hospitalization, surgery and injury, together with evidentiary matters concerning the action and defenses, to disclose the issues and related arguments on appeal. The evidence not only was highly conflicting in nearly every respect, but the meaning, interpretation, and weight to be accorded much of the expert testimony provides further ground for disagreement. Matters summarized hereafter fairly disclose evidence from which the jury determined the issue of liability in plaintiff's favor.

The greater trochanter, in lay language, generally is designated the hip bone. The femur, or thigh bone, has projections to which numerous muscles and ligaments are attached. The buttocks complex of muscles attach to the trochanter and are important

to position of the hips in walking. Since childhood plaintiff, who earned her living as a waitress, had suffered from chronic, localized osteomyelitis of the right greater trochanter.

Defendant had attended plaintiff as early as 1948, when x-rays disclosed involvement of the trochanter, and surgery was advised. That year plaintiff was operated on unsuccessfully by another surgeon. In 1955 plaintiff returned to defendant for examination, and again surgery was advised. In May 1959 plaintiff, bearing a slight limp and painful hip was examined again, x-rays disclosing greater damage with some loosening of the bone. Defendant's evidence, denied by plaintiff, showed a history of injury to the hip from an undisclosed source. In August 1959 defendant conducted further examination and took a history of further injury to the right hip, from a fall sustained while doing housework, resulting in swelling and discoloration indicative of deep hemorrhage. Diagnosis was deep periosteal hematoma with secondary infection, abscess formation. Defendant's evidence as to history of injury was denied by plaintiff.

On August 26, 1959, plaintiff went to the hospital and upon payment of $250.00 was admitted by defendant, who assured her surgery would correct this condition and she would be walking about in 4 or 5 days. Plaintiff was put to bed, given a sedative about 2 P.M. and at 2:30 was given a shot which put her to sleep, surgery having been scheduled for 3 P.M. Scheduled surgery was interrupted and a further pre-anesthetic injection was administered about 4:15, prior to 5:30 when surgery finally began. Apparently being short of assistants, defendant directed an employee (Miller), who acted as receptionist and PBX operator, to report to the operating room nurse (Mrs. Wetzel) for instruction as to "scrubbing in", and defendant then would show witness what she was to do by way of assisting in the surgery. Witness never had assisted surgery, but was directed to hold retractors used to keep the incision open during surgery. Witness performed this task, but turned her head and looked out the window during surgery for fear of fainting, and immediately left the hospital after the operation was finished.

Plaintiff was given a spinal block, placed on her left side upon the operating table and a long incision was made over the right hip. Defendant then removed part of the hip bone (greater trochanter) in ten pieces, largest of which was approximately 3 x 2 x 1¼ inches. The operation site was near the sciatic nerve. Time consumed in surgery approximated three hours, during which plaintiff regained sufficient consciousness to feel intense pain and hear defendant order another shot given, after which plaintiff again became unconscious. Whether plaintiff regained consciousness or was in condition to feel pain or hear conversation is disputed. Hospital records did reflect injection of a pain killer at 6 P.M., some hour and a half after surgery began. During surgical procedures plaintiff's leg was rotated in the socket.

After surgery plaintiff was returned to her room and placed upon the bed by an orderly. She roused sufficiently to see the orderly and members of her family, and complain of hot, burning pain from the knee down to her toes, because of which she received further sedation. On defendant's orders plaintiff was administered heavy sedation (morphine) about every 4 hours the first 3–4 days, because of complaint of burning pain in the right leg.

The most controverted testimony concerns post-operative care. Plaintiff's evidence was that for the first few days she was kept prone with a pillow under her knee. Being unable to move the nurses would turn plaintiff, causing extreme pain. No pillow was used under her foot, only under the knee to ease pain. Plaintiff testified when taken to the emergency room on the 10th day for removal of the drainage tube defendant observed her foot and inquired how long it had been "laying down like that." Upon plaintiff's statement this had existed since she came from under the anesthetic and was "killing her", de-

fendant pushed the foot up straight and inquired whether it hurt. Mention was made of the pillow under plaintiff's leg. Defendant condemned the nurses for stupidity, and stated if a pillow was to be used at all it should have been to the bottom of the foot to hold the foot in position. Defendant then directed an orderly to prepare and tightly apply a splint from above the knee down under plaintiff's foot. This caused more pain. Upon removal of the drainage tube from the incision defendant pointed to the red blood, stated the wound had healed well and that plaintiff would have no more trouble with her leg. However, the same day defendant dictated a letter, and had plaintiff acknowledge receipt of a copy, with two hospital employees witnessing the transaction. The text of this letter stated:

"This will serve to inform you of the instructions to exercise the toe and foot on the right side because of the foot drop I have just noticed and after thorough analysis and finding out the details from you about the pillow under your calf of your leg, and never moving your legs was the probable cause. In fact, the nurses told me repeatedly that you would not move, that you said you had always lain on your back. And, furthermore, since your operation you always screamed with pain when anyone attempted to move you.

"In other words, I think, unquestioningly, that the thing that has caused your foot drop is the fact that you laid so long, so quietly on your back with pillows under your legs. And if this be true, that this is the real cause, then it may be six months more or less before the ability to move your toe and foot upward returns.

"The splint which I am putting on will serve to relax the temporarily paralyzed muscles on the front. And furthermore, prevent the heel cord from shortening. If this splint proves to be too uncomfortable, then I will, before you go home, apply a plastic shell splint which should support your foot and toe much more comfortably. You must notify us immediately if you feel any pressure around the heel or any other place for it is easy for the splints to cause a pressure sore. If possible, I will work out some arrangement so that your foot can be removed from the splint or plastic support daily when you go home, in order to massage the muscles and to give you a chance to exercise. If the power in the paralyzed muscles does not return within a comparatively short time, I will procure a brace that will fit to your shoe and that will hold up your foot. This letter is in duplicate. One copy for me and one copy for you."

Originally plaintiff had been scheduled 4 to 5 days for surgery and hospital care at a set figure, but on the 4th day defendant requested and received $100.00 additional from plaintiff. Although plaintiff was continuing to suffer extreme pain, defendant directed stoppage of drugs, although there was testimony this was done for her benefit and injections of sterile water seemed sufficient to allay her emotions and complaints. On September 6th defendant's wife requested additional payments. Plaintiff could not secure further funds and, being unable to secure relief from pain, determined she would be better off elsewhere and was taken to her son's home in an ambulance, where she remained bedfast, unable to move about and suffering pain for 12 days. During this period defendant made two house calls, and plaintiff returned to the hospital for several therapy treatments.

Later defendant recommended plaintiff be examined by a neurosurgeon (Dr. Stowell), who placed plaintiff in another hospital October 8, 1959, where she remained until November 12, 1959. During this hospitalization the surgeon blocked certain nerve roots to stop sciatic nerve pain, and recommended an operation (sympathectomy) to block the sciatic nerve. Plaintiff did not accept such recommendation since another orthopedist (Dr. Peters) whom Dr. Stowell called into consultation,

advised plaintiff against this procedure. Upon discharge from the hospital, Dr. Stowell's final diagnosis was "Contusion, sciatic nerve." The doctor testified that largely the peroneal nerve was involved; there had been interruption of the nerve fibers of the peroneal, but patient's improvement over a period of time led to diagnosis plaintiff's injury was of traumatic nature in the sense of pressure phenomena, the nerve having been pressed upon or interrupted. Plaintiff suffered from dropped foot, but had shown gradual improvement. However, maximum recovery period was two years, and plaintiff still suffered weakness, limitation of dorsiflexion, and there had been no improvement between July 1961 and September 1962. Dr. Stowell testified he could find no organic reason for loss of sensation in tibial nerve. In 1961 a neurolysis had been recommended, which consists of taking a nerve out of a bed it might be in and removal of any scar tissue from around the nerve to permit the nerve to function.

Dr. Peters, a qualified orthopedic surgeon who examined plaintiff, was of the opinion plaintiff's injury resulted from an infectious process, only the peroneal branch of the sciatic nerve being affected by infection, but admitted rotation of the hip socket could affect the peroneal nerve and not the tibial. After examining plaintiff Dr. Peters had advised defendant there was inability to use the hamstring muscle— "Complete palsy from notch on down; cannot use hamstring; hamstring sciatic." The doctor admitted a dropped foot could result from injury to the peroneal nerve occasioned by undue pulling of the nerve; and it is possible to exert sufficient traction to cause permanent injury to the peroneal nerve. Diagnosis in 1964 was that plaintiff had footdrop affecting peroneal nerve of right side, branch of sciatic nerve, on basis of local extension of infection produced by toxins from staphylococcus aureus infection from which plaintiff suffered originally. The doctor's trial testimony placed infection site behind the knee; there was no evidence of trauma to sciatic nerve since only the peroneal branch was affected.

Defendant testified as his opinion the infection involved the nerve sheath at or near the bifurcation of the sciatic nerve into tibial and peroneal nerves, slightly below midway of the thigh. The initial conclusion placed the damage behind the knee. Corroborative evidence tending to support defendant's position appeared in the written statement of the nurse (Wallitz) who, although not a registered nurse, was defendant's surgical assistant. This party's testimony also was presented by deposition. Testimony of other witnesses germane to argument will be noted as involved in the contention under consideration.

When plaintiff rested defendants demurred separately to the evidence. Demurrer of Sisler d/b/a Mercy Hospital was sustained, defendant's individual demurrer being overruled. The case was submitted to the jury solely upon issues concerning the post-operative care. The jury returned a verdict ($47,500.00) in plaintiff's favor, upon which the judgment involved in this appeal was rendered.

■ Seven contentions presented on appeal urge eight alleged errors as grounds for reversal, the first being the trial court's lack of jurisdiction over the subject matter. Defendant insists the first cause of action failed upon the merits, because plaintiff had two remedies: (1) seek leave to reopen and introduce additional evidence; (2) ask leave of court to dismiss without prejudice. On this basis defendant says plaintiff elected a remedy by attempting to dismiss, rather than exercising the right to reopen granted by the trial court. In this manner defendant concludes the action failed upon the merits, and could not be refiled under the rule stated in Powell v. Chastain, Okl., 359 P.2d 336.

It is observed defendant's argument is predicated upon assumption the trial court indicated an intention to sustain demurrers to all causes of action, and plaintiff dismissed solely to escape a total adverse ruling. The record does not support this posi-

tion. The trial court stated quite clearly no demurrer was sustained as to the first cause, but plaintiff was permitted to reopen for purposes connected with this cause of action. We are not impressed by argument this proceeding smacks of trickery in trial practice, nor in defendant's claim our case law relating to dismissal under 12 O.S.1961, § 100 and 12 O.S.1961, § 683, should be rewritten explicitly to cover the present situation.

The trial court approved plaintiff's dismissal, overruling defendant's objections to this action. In City of Tulsa v. Myrick, 184 Okl. 229, 86 P.2d 623, we approved dismissal after demurrer to the evidence had been sustained, as a failure other than upon the merits. In that case we recognized the reason and object of the statute is to give time for a second action when the first action for any reason is ineffectual for recovery. And, in Tiffany v. Tiffany, 200 Okl. 670, 199 P.2d 606, we stated unequivocally that it is *final submission* of a case upon both law and fact which is determinative of the question. Numerous decisions support this view. Because the record discloses the cause was not finally submitted, and since the trial court approved plaintiff's dismissal, it is unnecessary to consider the extent of trial court's discretion to permit voluntary dismissal after final submission of a cause.

Defendant's third contention asserts error because the trial court combined inconsistent causes of action at trial, rather than requiring plaintiff to elect one cause. The trial court required plaintiff to elect which two of four causes of action alleged would be tried. Plaintiff elected the cause of action based upon negligence and that alleging injury resulting from fraud and misrepresentation. Prior to trial plaintiff was permitted by interlineation, to amend her first cause of action to allege:

"At no time did defendant advise plaintiff that she might end up with a partially paralyzed right leg if she submitted to the surgery, so that her consent was without sufficient knowledge and not real."

Plaintiff attempted to allege a cause of action for assault and battery under the fourth cause of action. The trial court held this allegation to be inconsistent with actionable negligence. However, the quoted amendment was permitted, upon reasoning stated in Mayor v. Dowsett, 240 Or. 196, 400 P.2d 234, as alleging an additional ground of negligence. Defendant takes the position this was tantamount to making the fourth cause of action an issue, resulting in presentation of inconsistent theories. Although admitting the causes of action emanated from the single transaction, defendant insists he had to defend three inconsistent causes of action and the trial court erred in refusing to compel plaintiff to elect between the remedies.

We recognize the doctrine of election precludes a plaintiff from maintaining an action for two inconsistent remedies. Gains Bros. Co. v. Fourth Nat. Bank, etc., 192 Okl. 59, 133 P.2d 742, 144 A.L.R. 1434. We further recognize this doctrine presupposes a right to elect, under such conditions of fact that will afford a party choice of remedies inconsistent in character. Town of Pittsburg v. Cochrane, 200 Okl. 497, 197 P.2d 287. The doctrine applies where there are coexistent remedies available at time of election which are repugnant and inconsistent. The rule is based upon the theory pursuit one inconsistent remedy involves or implies negation of others. The rule does not apply where the remedies are merely concurrent or cumulative. See generally 25 Am.Jur.2d, Election of Remedies §§ 9, 10, 11; 28 C.J.S. Election of Remedies § 4. In Taylor v. Robertson Pet. Co., 156 Kan. 822, 137 P.2d 150, 154, that court stated:

"* * * To make actions inconsistent one action must allege what the other denies, or the allegation in one must necessarily repudiate or be repugnant to the others."

Also see McMahan v. McMahon, 122 S.C. 336, 115 S.E. 293, 26 A.L.R. 1295; Abdallah v. Abdallah, CCA(3rd) 359 F.2d 170, 17 A.L.R.3d 967; Larkin v. Tallant, 201 Okl. 436, 206 P.2d 982.

■ Consideration of this matter impels the conclusion this complaint, concerning failure to require election of remedies, is confused with remedies which are defined as concurrent, cumulative and consistent remedies, as to which doctrine of election does not apply. Where remedies are alternative or concurrent there is no bar until satisfaction has been obtained, absent advantage to plaintiff or disadvantage to defendant. 25 Am.Jur.2d, Election of Remedies § 12. In Walker v. McNeal, 132 Okl. 40, 269 P. 295, we held the plaintiff could pursue concurrent remedies at the same time, until there was satisfaction of the debt.

Mayor v. Dowsett, supra, is cited by both parties in the present case. Essentially the same argument was there advanced as defendant makes here. In Mayor plaintiff requested leave to amend to allege negligence in various particulars connected with ministering spinal anesthetic, particularly in failing to gain plaintiff's consent. Holding the trial court's action reversible error, that court held the requested amendment did not state a separate cause of action for assault and battery, but was simply an additional specification of malpractice. The amendment was cast in terms of negligence and, since standard medical practice required securing the party's prior consent, violation of that duty would constitute negligence or malpractice. The Oregon court cited extensive authority for the view that statutes of limitation governing assault and battery do not apply to charges of unauthorized treatment by a physician. Among these authorities is White v. Hirshfield, 108 Okl. 263, 236 P. 406, cited by defendant to support argument the trial court's permitted amendment did not allege breach of duty but alleged assault and battery as a separate cause of action.

■ The causes of action asserted by plaintiff were not inconsistent remedies which required an election. We hold the permitted amendment did not result in joining causes of action for negligence and assault and battery in violation of the doctrine concerning election of remedies.

■ Defendant also urges reversible error in the trial court's refusal to grant mistrial because plaintiff's counsel injected the matter of insurance into the case during voir dire examination of the jury. Discussion of argument upon this tendered issue is unnecessary. Generalized rules for voir dire examination relative to this matter have been delineated in Safeway Cab Service Co. v. Minor, 180 Okl. 448, 70 P.2d 76, and more recently in Redman v. McDaniel, Okl., 333 P.2d 500. Whether examination of the prospective jurors transgressed these guidelines we are unable to say, voir dire examination of jurors not being of record, but presented from the standpoint of each counsel's recollection of the matter. The trial court overruled defendant's motion because, within his own recollection, counsel for neither side objected to matters raised by opposing counsel on voir dire, nor asked that the jury be admonished to disregard such matters. No record of the claimed objectionable questioning is presented. Under this circumstance the only question is whether the trial court committed error upon the record. Absent this evidence it is presumed the evidence supported the trial court's finding. City of Yale v. Davenport, 175 Okl. 629, 54 P.2d 335.

■ Defendant's fourth proposition states:

"RES IPSA LOQUITUR HAS AGAIN RISEN ITS UGLY HEAD IN MALPRACTICE. THE CIRCUMSTANCES OF THE COURT'S INSTRUCTION COUPLED WITH THE ARGUMENT OF PLAINTIFF'S COUNSEL LEFT THE DOOR OPEN FOR THE JURY TO INFER NEGLIGENCE."

Summarized, defendant argues the trial court gave one instruction (No. 17) which injected res ipsa loquitur into the case, and was abnormally amplified by argument of plaintiff's counsel. Further, defendant insists the questioned instruction was not cured by a proper instruction, and also was in conflict with two other instructions (Nos. 14 and 15). Additionally, argument relative to the instructions is coupled with argument such instruction allowed the jury, to consider evidence of no value, reject positive evidence, and then accept circumstantial evidence to establish a presumption of negligence.

■ We have defined circumstantial evidence and the degree required for proving facts essential to support a cause of action innumerable times. It is axiomatic any fact may be proved by direct evidence, circumstantial evidence, or a combination of both. Chickasha Cotton Oil Co. v. Hancock, Okl., 306 P.2d 330. The instruction complained of is recognizable as a "stock instruction" given in practically every civil case. We cannot ascribe the degree of malevolence to the instruction which defendant finds there, particularly in view of instructions Nos. 13, 14, 15, which so clearly told the jury what was required to determine the standard of care; that a party's failure to secure good results from an operation was not grounds for liability without proof of negligence and carelessness; that plaintiff could not recover unless the jury found from expert testimony defendant was guilty of negligence which was proximate cause of injury.

■ Evidence reasonably tending to prove essential facts directly, indirectly, or by permissible inference is sufficient to support a judgment. Essential facts may be proved by circumstantial evidence, and it is unnecessary circumstantial evidence rise to that degree of certainty which will exclude every reasonable conclusion other than that reached by the jury. Cities Service Gas Co. v. Eggers, 186 Okl. 466, 98 P.

2d 1114, 126 A.L.R. 1278. Also see 20 Am. Jur.2d, Evidence §§ 4, 1189, and annotations.

■ A further contention claims reversible error resulting from the trial court's giving of instruction No. 19, which used the permissive "may" in reference to plaintiff's contributory negligence. So often we have reiterated that no one instruction need contain all law applicable to the case, since the instructions are to be considered as a whole. This contention lacks substantial merit in view of the comprehensive statement of law applicable to contributory negligence contained in the trial court's instruction No. 5.

Defendant's sixth contention urges error in that arguments by plaintiff's counsel constituted misconduct and, objections thereto being overruled, necessarily prejudiced the jury. A portion of the argument was incorporated under the fourth contention, wherein defendant urged the trial court's instructions when coupled with counsel's argument, erroneously "left the door open for the jury to infer negligence."

The record reflects counsel for each party strenuously sought to place the opposing party in a bad light before the jury. Reasonable categorization of matters asserted by each side as creating prejudice, or having resulted from retaliatory remarks, comparisons and innuendos, justifies stating the trial court displayed considerable leniency to counsel in their closing arguments. Objections were sustained to several statements by plaintiff's counsel and the jury admonished such matters were not to be considered.

■ Basically, arguments of counsel in trial of any case are matters peculiarly within the trial court's discretion. The great range of alleged prejudicial arguments, and the effect of these arguments when considered on appeal, are observable from the decisions in City of Shawnee v. Sparks, 26 Okl. 665, 110 P. 884, L.R.A.

1918D, 1; Green Const. Co. v. Lampe, 174 Okl. 351, 50 P.2d 286; Hazelrigg Trucking Co. v. Duvall, Okl., 261 P.2d 204; Chicago, R. I. & P. R. Co. v. American Airlines, Inc., Okl., 408 P.2d 789. In Duvall, supra, we noted the case was strenuously contested, and with apparent recrimination upon both sides, and contained arguments assertedly prejudicial as objectionable, outside the issues and calculated to prejudice the jury. However, in affirming that judgment we observed:

"It is to be expected that in the heated contest of any lawsuit the natural zeal of counsel in presentation of his case may lead to indulging in rhetorical flights, or the making of too violent deductions which are neither fully borne out by the testimony nor wholly necessary to legitimate discussion of the issues. Although not condoning arguments or conduct which obviously transgress professional ethics in an effort to play upon sympathy of a jury or induce a feeling of prejudice against one party, it must be recognized that different counsel perform in very different manner. Conduct of counsel is a matter to be left largely within the discretion of the trial judge. Assuming that the argument objected to by defendant presented deductions not justified by the record, the jury specifically was admonished not to consider such matters. It is presumed the jury followed the trial court's instructions. For this reason we are unable to say that defendant did not have a fair trial, or that the alleged misconduct of counsel in his argument to the jury was such as to require reversal of the judgment rendered. * * *"

Defendant contends the jury's verdict was excessive. The argument, which erroneously asserts lack of any evidence as to plaintiff's earnings, is predicated upon items of evidence most favorable to defendant. This evidence defendant interprets as disclosing the nature and extent of plaintiff's total impairment, without regard to other, equally positive evidence disclosing plaintiff suffered pain, was unable to walk more than a short distance without wearing her brace, had been unable to work except for a short period, and suffered pain. There was testimony plaintiff was able to perform ordinary manual labor despite her physical limitation, could work as a waitress, and walk everal blocks without disability or pain. It is apparent the jury weighed this evidence against plaintiff's testimony showing pain, discomfort, limitation of activities, and inability to work since 1959. From this evidence the jury found plaintiff had suffered loss of earning capacity, had undergone pain and suffering which probably would continue, and assessed the amount of recovery upon this basis.

Efforts to review and compare awards of damages for personal injuries upon the basis of excessiveness of verdicts, as opposed to those held not excessive, would be impossible. Against the present claim of excessiveness, attention is directed to the result in Booth Tank Co. v. Symes, Okl., 394 P.2d 493. There a farm wife with 16.43 years life expectancy with permanent loss of earning capacity of approximately $1,000.00 annually, who refused medical care which would have bettered her condition, was awarded an amount far in excess of the present judgment. We approved that verdict as not excessive, and in syllabus 6 stated:

"In an action for personal injuries a verdict will not be set aside for excessiveness of damages unless it clearly appears that the jury committed some gross and palpable error, or acted under some improper bias, influence or prejudice or has totally mistaken the rules of law by which damages are regulated."

The principal ground argued for reversal concerns defendant's claim of error based upon asserted insufficiency of the evidence to support the verdict. Further extensive review of the evidence will not be

undertaken. The verdict rendered displayed the jury's belief of plaintiff's evidence relative to the operation, the nature and extent of care extended post-operatively, and resultant disability. We mentioned earlier the only matter of complete agreement was the fact plaintiff had suffered a dropped foot.

The medical evidence presented three different causes for plaintiff's injury. Initially, as disclosed by defendant's letter, the cause of the footdrop unequivocally was declared to have resulted from plaintiff's remaining quietly in bed with a pillow under her legs. The evidence that defendant prescribed proper post-operative care for plaintiff's foot was conflicting, and there was evidence from which the jury was warranted in finding breach of duty on part of defendant's employees, resulting in the footdrop. The contradictions and conflicts in defendant's evidence on many features of the case undoubtedly was considered by the jury.

Other medical testimony provided two separate theories or causes for plaintiff's injury. Dr. Stowell defined the cause of footdrop and gave his opinion there was some affectation of the nerve. This finally was diagnosed as contusion of the upper sciatic, or peroneal nerve, which was traumatic in sense of the pressure phenomenon. The site of plaintiff's trouble was considered to be behind plaintiff's knee. Dr. Peters testified unequivocally plaintiff's disability was the result of an infectious process attacking the peroneal nerve near the hip.

At the trial defendant was inclined to adopt the infection theory, but was of the opinion infection invaded the nerve sheath at the bifurcation of the sciatic nerve. There was testimony plaintiff's leg was rotated at the hip socket during surgery, and medical testimony that rotation could affect the peroneal nerve, or undue pulling of the nerve could result in palsy.

From this brief résumé of medical evidence it is apparent there was a minimum of five possible causes of plaintiff's disability, according to medical testimony, from which the jury was required to determine cause of injury. The evidence concerning the cause of plaintiff's injury was conflicting. Other evidence bearing upon the question whether the post-operative care was as required, and discharged with ordinary diligence, also was in conflict. In determining whether defendant extended plaintiff skillful and proper care, the jury was not bound to accept or to select one or more of the conflicting medical conclusions advanced to relieve defendant of liability. The weight to be given such expert testimony was entirely for the jury.

[redacted] The test for determining sufficiency of plaintiff's evidence to withstand a demurrer or motion for directed verdict does not require reiteration. The trial judge properly applied the test, overruled the motion, and left the issues for the trier of the facts. By their verdict the jury determined plaintiff's disability resulted from failure to receive ordinarily skillful and proper care. This determination is supported by competent evidence. Orthopedic Clinic v. Hanson, Okl., 415 P.2d 991.

Upon motion by defendant in error, judgment hereby is rendered against the surety on supersedeas bond for the amount adjudged by the trial court, together with interest and costs, but not to exceed penal sum of the bond. This judgment shall be enforced in the trial court as though therein rendered.

Affirmed.

DAVISON, WILLIAMS, BLACKBIRD, JACKSON, HODGES, LAVENDER and McINERNEY, JJ., concur.