Argued July 14, affirmed October 24, 1978

CONTROLTEK, INC., *Appellant,*
*v.*
KWIKEE ENTERPRISES, INC., *Respondent.*
(TC 76-03-03557, SC 25532)
585 P2d 670

Gerald R. Pullen, Portland, argued the cause and filed the brief for appellant.

James G. Richmond, Roseburg, argued the cause and filed the brief for respondent.

Before Holman, Presiding Justice, and Tongue, Bryson, and Lent, Justices.

TONGUE, J.

## TONGUE, J.

This is an action at law by a manufacturer against a commercial purchaser of some of its products alleging failure to pay a balance due of $9,027.28. Defendant counterclaimed for breach of an implied warranty of fitness for a particular purpose, as provided by ORS 72.3150. The case was tried before the court, without a jury. The court found that defendant was entitled to a credit for defective goods and that the balance due, after deduction for such a credit, was the sum of $1,335.25. Plaintiff appeals from the judgment in that amount. We affirm.

The product purchased by defendant from plaintiff was an electronic control device for the operation of a "Lectro-Matic" step sold by defendant for installation in motor home trailers. Plaintiff assigns as error the finding by the trial court that defendant proved by substantial evidence a breach of an implied warranty of fitness for a particular purpose. Plaintiff contends that "there are no warranties when the units are manufactured according to the buyer's specifications"; that defendant "did not show a justifiable reliance"; that defendant had "equal or superior knowledge and skill in the design, manufacture and testing of its own invented product, the 'Lectro-Matic' step, and inspected and tested every unit before selling to its own customers"; and that defendant "never proved any defect except [that] some of the steps did not work."

This being an action at law, we must affirm the findings by the trial court if they are supported by any competent evidence.

### The facts.

Defendant is engaged in the manufacture and sale of special equipment for installation on motor homes and recreational vehicles by their manufacturers. One of these items is an automatic extendable-retractable step which was manufactured and sold by defendant

[ 125 ]

under the name "Lectro-Matic" step. Prior to defendant's purchase from plaintiff of an electronic control device for the operation of the step, defendant had used an electrical-mechanical control unit. Defendant had some problems with that unit in that it was exposed to weather and subject to corrosion and a "leaf switch" on the unit was not satisfactory.

Defendant was looking for a control unit that would overcome these problems and thought that the use of an electronic device might be feasible. Discussions followed between defendant and plaintiff, a manufacturer of electronic devices.

Defendant described these problems to plaintiff, and delivered to it a brochure describing the "Letro-Matic" step, as well as one of the units. Defendant wanted "the operation of it duplicated" by the use of an electronic control device so that it would "work every time." No formal or written specifications were prepared by defendant or delivered to plaintiff. There was evidence that defendant at that time had no expertise in electronics and that it relied on plaintiff for such expertise.

Plaintiff then "designed and built an electronic unit to simulate the same operation." In doing so it chose the circuitry and parts. To solve the problems of corrosion and to protect delicate parts from the weather, plaintiff decided that the units should be totally enclosed or "potted" by "pour[ing] a potting compound into the box so that it would completely encapsulate any electronic items." According to plaintiff, once the unit is thus "encapsulated," "you have no recourse if it is not working properly."

Defendant then supplied to plaintiff a frame, battery, step, weight and counting device for the testing of the units by plaintiff before shipment to defendant. Plaintiff subsequently built its own testing equipment. All units were tested by plaintiff both before and after the units were "potted." The units were again tested by defendant "the best way they could

test them" before shipment to its customers. As previously stated, however, by then the units were completely enclosed in "potting compound," which could only be removed by the use of a solvent. It also appears that plaintiff did not provide defendant with the electrical diagrams for the control units.

Apparently the new electronic control units produced by plaintiff solved the previous problems resulting from corrosion and the "leaf switch." Defendant purchased 1,000 of such units from plaintiff. Plaintiff then sent to defendant a letter with an express warranty for one year that the controls were "free of defects in material and workmanship." Defendant subsequently sold "Lectro-Matic" steps equipped with the electronic control units to the manufacturers of mobile home trailers.

There was testimony that in the beginning "nearly all" of the units purchased from plaintiff were returned to defendant by its customers because "they didn't work" in "field conditions" and "did not emit or contract the step on command of the door opening or closing," as they were designed to do; that, as a result, defendant lost customers, and that defendant could not determine why the units were failing because "they were potted" and "you couldn't see inside the unit."

Many of the units returned to defendant by its customers were then returned by it to plaintiff for credit. Plaintiff offered testimony that tests made by it on 200 of the first units returned utilizing the same testing procedures as used prior to their original shipment showed that most of them worked "good." Plaintiff did, however, allow credit to defendant for 73 units. No other tests were conducted. Plaintiff subsequently made some "modifications" to the circuitry and added a "senior device" or "timer" on subsequent units shipped to defendant in filling the original order for 1,000 units. These modifications were also enclosed within the plastic material. In addition, plaintiff

prepared and sent to defendant a written statement of "operational parameters," to which defendant made no objection or other response.

Plaintiff offered testimony that the "modified units * * * appeared to be working satisfactorily in the field" and that defendant wanted plaintiff to make further shipments to it under its original order for 1,000 units.

Defendant, however, offered testimony that it accepted the "modified" units because plaintiff assured it that they would be "good units," but that even after the modifications, units continued to be returned by its customers because they did not work; that although it had tested such units before shipment to its customers, its testing was "inadequate"; that defendant then stopped using plaintiff's electronic control device and used a different control unit, and that with this new control unit its "percentage of rejections now is less than one percent." Meanwhile, over 600 units were returned to defendant by its customers, of which 373 were returned by defendant to plaintiff for credit.

*There was evidence to support the findings by the trial court.*

The trial court made a finding of fact that "the seller impliedly warranted that the goods involved would be fit for a particular purpose and that 373 of the units produced by plaintiff for defendant were defective."

■ ORS 72.3150 provides for an implied warranty of fitness for a particular purpose, as contrasted with the implied warranty of merchantability under ORS 72.3140, which includes a warranty of fitness for ordinary purposes. The purpose of such a warranty is to protect the buyer of goods from bearing the burden of loss when the goods, although not violating an express warranty, do not meet the buyer's particular purpose.

■ A warranty of fitness for a particular purpose arises regardless of the seller's intent whenever (a) the buyer relies on the seller's skill or judgment to select or furnish suitable goods, and (b) the seller at the time of contracting has reason to know the buyer's purpose and that the buyer is relying on the seller's skill and judgment.[1] Such a warranty may arise when, as in this case, a businessman buys goods that have to be specially selected or particularly manufactured and assembled for his business.[2]

■■ It is true, as contended by plaintiff, that there are no such warranties when goods are manufactured in accordance with specifications provided by the buyer. In such an event, the buyer does not rely on the seller's skill or judgment.[3] In this case, however, there was evidence from which the trial court could properly find that no specifications were given by defendant for the electronic control unit to be manufactured for it by the plaintiff; that defendant relied upon the skill and judgment of the plaintiff in the design and manufacture of that electronic unit; that defendant had no expertise in electronics and that it was justified in such reliance.

It is also true, as next contended by plaintiff, that in some cases there might be no justifiable reliance by a buyer who has equal or superior knowledge and skill in the design and manufacture of the product purchased by him.[4] Again, however, it was a question of fact in this case whether defendant had knowledge and skill "equal or superior" to that of the plaintiff. There was evidence to support a finding by the trial

[1] *See* 1 Anderson, Uniform Commercial Code 657-660, §§ 2-315:3 to 2.315:9, inclusive (1970). *See also Valley Iron and Steel v. Thorin,* 278 Or 103, 109, 562 P2d 1212 (1977).

[2] *See* White and Summers, Uniform Commercial Code 297, § 9-9 (1972).

[3] *See* 1 Anderson, *supra,* n.1, 664, 666, §§ 2-315:19 and 2-315:21; and *Valley Iron and Steel v. Thorin, supra,* n.1, 108. *See also* White and Summers, *supra,* n.2, 298, § 9-9.

[4] *See* White and Summers, *supra,* n.2, 298, § 9-9, and *Valley Iron and Steel v. Thorin, supra,* n.2 at 110.

court that defendant had no knowledge or expertise in electronics, as did the plaintiff, and that defendant did not have equal or superior knowledge and skill in the design and manufacture of the *electronic control unit* which it purchased from plaintiff for its "Electro-Matic" step, even though it may have had superior knowledge and skill in the design and manufacture of the remaining components of that step.

■ Plaintiff also contends, however, that defendant cannot claim that it relied upon the plaintiff because defendant "inspected and tested every unit before selling [it] to its own customers." It is true that when a buyer in fact makes an examination of goods and accepts them, with no complaint, there may be a waiver of any matter on which a claim for breach of such a warranty could be based.[5] When, however, the defect is latent, so that such an inspection will not reveal its existence, there is no proper basis to infer an intent to waive such a defect.[6] There was evidence in this case from which the trier of the fact could properly find that because the electronic control devices had been "potted," any defects were "latent" defects and would not have been revealed by the inspection and tests made by defendant upon receiving them from plaintiff.

■ Finally, plaintiff contends that defendant "never proved any defect except [that] some of the steps did not work." It is true that defendant did not prove any specific defect in the design or manufacture of the electronic control device. It is also true that there may have been other reasons, such as improper installation, why the steps did not work properly. There was evidence, however, that the "Lectro-Matic" step with the electronic control "didn't work" in the "field"; that of the 1,000 units sold to defendant by plaintiff over 600 were returned to defendant by its customers; that

---

[5] *See* ORS 72.3160 and Anderson, *supra,* n.1, 669, 711-17.

[6] *See* ORS 72.3160(3)(b); 1 Anderson, *supra,* n.1, 669, 716-717; and Annot., 168 ALR 389, 427 (1947).

defendant then substituted a new and different control device for its step, and that its "percentage of rejections" then dropped to "less than one percent."

We believe that from such evidence the trier of the fact could properly infer that the electronic control devices sold by plaintiff to defendant were in fact defective.[7] Plaintiff makes no contention that the trial court's computation of damages was improper.

The findings and judgment of the trial court were supported by competent evidence and are affirmed.

---

[7] *Cf Landers v. Safeway Stores, Inc.,* 172 Or 116, 139, 139 P2d 788 (1943), and *Cowgill, Adm'r v. Boock, Adm'r,* 189 Or 282, 292, 218 P2d 445 (1950).