AMERICAN FERTILIZER
SPECIALISTS, INC., a
corporation, Appellant,

v.

A. J. WOOD, Jr., Appellee.

No. 53660.

Supreme Court of Oklahoma.

Oct. 6, 1981.

Clyde Stallings, Durant, for appellant.

Fischl, Culp, McMillin, Kern & Chaffin by Terry C. Kern, Ardmore, for appellee.

LAVENDER, Justice:

Plaintiff, a dealer in agricultural fertilizer, brought suit on open account for fertilizer sold and delivered to defendant for use on defendant's grass lands. By way of defense, defendant alleges breach of an implied warranty of fitness for a particular purpose and breach of an implied warranty of merchantability under the Uniform Commercial Code-Sales.[1]

Plaintiff does not contest its status as a "merchant" within the meaning of § 2–104(1),[2] but contends that defendant failed to meet its burden of proving a breach as to the accepted goods as is required by § 2–607(4),[3] and failed to give the seller (plaintiff) timely notice thereof pursuant to § 2–607(3)(a),[4] particularly in light of the provisions of § 1–204(2).[5]

In jury-waived civil actions trial court's findings have force and effect of the jury's verdict and when finding is general it is finding of every specific thing necessary to be found sustaining general judgment and such judgment will not be disturbed on appeal in the absence of legal errors, if there is any competent evidence reasonably

**1.** 12A O.S.1971, § 2–101 et seq.

Section 2–315 in pertinent part provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose."

Section 2–314 insofar as is pertinent provides: "(1) Unless excluded or modified ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind ....

\* \* \* \* \* \*

"(2) Goods to be merchantable must be at least such as ... (c) are fit for the ordinary purposes for which such goods are used ...."

**2.** Section 2–104(1) provides: " 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by the employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

**3.** Section 2–607(4) provides: "The burden is on the buyer to establish any breach with respect to the goods accepted."

**4.** Section 2–607(3)(a) provides: "Where a tender has been accepted ... the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy; ...."

**5.** Section 1–204(2) provides: "What is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action."

tending to support the trial court's conclusion.[6]

Defendant, a cattleman-rancher, had pursued a successful program of fertilizing his grass lands for fifteen to twenty years. In recent years, he had applied a fertilizer called 10–20–10 during the first of March each year with what he characterized as near perfect results. On March 4, 1978, defendant was approached by Crawford, a sales representative of plaintiff, to induce a sale by plaintiff to defendant of commercial fertilizer. Crawford suggested that defendant use Triple 19 fertilizer which he said would get better results, representing that it was less costly and better per unit. Defendant and Crawford inspected a tract of defendant's land known as the South Taylor Alfalfa 40. The tract had fescue and clovers on it which had started Spring growth. Crawford agreed that the land was ready to be fertilized and stated that his Triple 19 would do the job. The ground was moist and the temperature was normal for early March. Crawford was informed that defendant used the ground both for cattle grazing and for haying. Crawford recommended that the land be fertilized by application of 250 pounds per acre, the quantity which defendant had applied of 10–20–10 in past years. Defendant agreed to purchase Triple 19 fertilizer from plaintiff for application on 183 acres including the 40-acre tract, the fertilizer to be spread by Crawford. The fertilizer was spread on March 11. Defendant mailed a check for the fertilizer to plaintiff on April 4, 1978. A second application of fertilizer was made on April 6. Based upon past experience, defendant expected visible results within three days from application; but observing none, he summoned two representatives of plaintiff for a meeting on April 22. One of the representatives agreed that the fertilizer was not doing what it was supposed to do and that "he" would make it right. Defendant stopped payment on the check on about April 16. Plaintiff did nothing fur-

ther. Thereupon defendant contracted with another fertilizer company to apply Triple 17 to said lands, except for the 40-acre tract, with good results. The South Taylor Alfalfa 40 yielded only half the hay as in previous years, and less than adjoining lands which had no application of fertilizer at all. The cattle pastured on the lands fertilized with Triple 19 were adversely affected in that they suffered a condition not observed in defendant's cattle pastured on the land in previous years. Defendant refused to pay plaintiff for the fertilizer.

Simmons testified for plaintiff, stating that in agriculture you cannot guarantee anything other than the analysis of units per hundred weight. He testified that there are something like 57 things that control the making of a crop, but none were identified, nor was there any testimony that any of them affected defendant's hay crop. He further testified that within three weeks or 30 days from the application of Triple 19 the grass should look dark green and "come on." A farmer who fertilizes expects to grow something, to get more growth, better quality, and more protein. If you get a good rain after fertilization, you should start getting some growth and the grass should start looking dark green within a week. After fertilization and rain, one should be able to look at the fertilized land and tell if the fertilizer is working. Simmons said that upon inspection he could not see any visible change between the fertilized and unfertilized property. When defendant asked Simmons what he thought of it, Simmons replied "it's just not doing what it's supposed to do," also stating he would make it right. Without further detailing the evidence before the trial court, we have no hesitancy in holding there was competent evidence reasonably tending to support the trial court's conclusion, and to support the judgment in favor of defendant on the ground of breach of implied warranty under both § 2–314 and § 2–315 of 12A O.S.1971.

**6.** *Givens v. Western Paving Co.*, Okl., 261 P.2d 450 (1953); *Rain v. Balph*, Okl., 293 P.2d 359 (1956); *Sparks v. Midland Supply Company*, Okl., 339 P.2d 1056 (1959); *Davis v. Pumpco,* *Inc.*, Okl.App., 519 P.2d 557; *Old Albany Estates v. Highland Carpet Mills*, Okl., 604 P.2d 849 (1980).

The defendant not only had reason to know the particular purpose for which defendant required fertilizer, viz., to increase the quality and quantity of his grass crop, he relied upon plaintiff's salesman's skill and judgment to select and furnish suitable fertilizer. Defendant had been a satisfied and successful user of 10–20–10 fertilizer for many years. He had not heard of Triple 19 until the salesman suggested it to him, and in reliance upon the salesman's representations that Triple 19 would get better results, would be less costly and better per unit, he contracted for the product.

■ The concept of "merchantability" referred to in § 2–314 connotes not best quality or perfection in detail, but it does require, at the very least, that the goods operate for their ordinary purpose.[7]

■ Where the seller is a merchant and the facts so warrant, there may be an implied warranty of merchantability and also one of fitness for the particular purpose.[8] And where there is a breach of warranty of merchantability, it is unnecessary to determine whether a seller is liable for breach of a warranty of fitness.[9]

■ Having established the existence of the warranty, the buyer has the added burden of proving that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained.[10] Plaintiff urges that where the buyer's proof is based upon speculation and conjecture, a mere showing of "poor results" from the use of the product falls short of meeting the established standard for proximate cause, citing the case of *Olin Mathieson Chemical Corp. v. Moushon*, 93 Ill.App.2d 280, 235 N.E.2d 263 (1968). While we agree that the rule set forth in *Olin Mathieson* is a correct statement of the law, the case is clearly distinguishable from the case at bar. In *Olin Mathieson*, the buyer purchased explosives from the seller for blasting in a rock quarry. A mere showing on the part of the buyer of poor results as compared with prior detonations at the quarry did not establish that the explosive failed to measure up to an implied warranty of fitness for the purpose intended. As the Court observed: "It could also be that the poor results were caused by failing to remove the broken rock from the toe and the loading to within five feet of the top. There is even a possibility that the shot holes were improperly drilled or that a difference in the rock formation was the cause. We have no evidence in this record that anything was wrong with the explosive except by reasoning backward, i. e., the result was poor; therefore, something must have been wrong with the explosive. In view of the other possibilities this is not enough."

■ Facts may be proved by circumstantial, as well as by positive or direct evidence, and it is not necessary that the proof rise to that degree of certainty which will exclude every other reasonable conclusion than the one arrived at by the trier of the facts. It is only required that it appears more probable that the defendant's poor grass crop was the result of the failure of

---

7. *Perry v. Lawson Ford Tractor Co.*, Okl., 613 P.2d 458 (1980).

8. See Uniform Commercial Code Comment to section 2–315 which states in part:
   "2. A 'particular purpose' differs from the ordinary purpose for which the goods are used in that it envisages a specific use by the buyer which is peculiar to the nature of his business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to uses which are customarily made of the goods in question. For example, shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains.
   "A contract may of course include both a warranty of merchantability and one of fitness for a particular purpose."

9. *Kassab v. Central Soya*, 432 Pa. 217, 246 A.2d 848 (1968).

10. See Uniform Commercial Code Comment to § 2–314 which states, in part:
   "13. In an action based on breach of warranty, it is of course necessary to show not only the existence of the warranty but the fact that the warranty was broken and that the breach of the warranty was the proximate cause of the loss sustained."

the fertilizer sold by plaintiff to defendant to nourish and enrich defendant's grass lands than any other possible cause.[11] This rule has been recognized in other jurisdictions and applied to cases involving breach of warranty under the Uniform Commercial Code.[12] It has also been held that where the warranty was as to the ingredients of fertilizer, evidence of the effect of the fertilizer on crops was admissible in connection with proof of the kind of soil, manner of cultivation, accidents of season, and other pertinent facts to prove that it did not contain the ingredients stated or in the proportion specified.[13] There was more than ample evidence from which the court below as the trier of the facts could reasonably infer that the fertilizer sold by the plaintiff to the defendant did not meet the prescribed standard of merchantability, was not fit for the ordinary purpose for which it was sold, and that the poor grass crop on defendant's lands was the proximate result thereof.

The next issue for consideration is whether under the facts and circumstances of this case the lapse of forty-two days from the date of the first application of fertilizer before notice of the breach was given constitutes a "reasonable time" under § 2–607(3)(a) of the Commercial Code. While the defendant testified that visible results from the application of fertilizer might be expected as early as three days after application, all of the witnesses testifying on the subject agreed that such results should be forthcoming within three weeks to thirty days. Thus there was competent evidence on the basis of which the court below could reasonably conclude that defendant should have discovered the breach of warranty within twelve days from the date of the giving of notice. In order for the buyer to avoid liability for the payment of goods accepted, he must notify the seller within a reasonable time after he discovers or should have discovered a breach of warranty.[14] The notification may be either oral or in writing and is sufficient if it is informative to the seller of the general nature of the difficulty encountered with the warranted goods by the holding of a majority of the cases dealing with this subject.[15]

In the case of *L. A. Green Seed Company of Arkansas v. Williams*, 246 Ark. 463, 438 S.W.2d 717 (1969) the court said: "The purpose of the statutory requirement of notice to the seller of breach of warranty is to enable the seller to minimize damages in some manner, such as correcting the defect, and also to give the seller some immunity against stale claims. Of course, the sufficiency of notice and what is considered to be a reasonable time within which to give notice of breach of warranty are ordinarily questions of fact for the jury, based upon the circumstances in each case." [16]

11. *Chickasha Cotton Oil Company v. Hancock*, Okl., 306 P.2d 330 (1957); *McCasland v. Burton*, Okl., 292 P.2d 396 (1956); *Sisler v. Jackson*, Okl., 460 P.2d 903 (1969); *Marathon Battery Company v. Kilpatrick*, Okl., 418 P.2d 900 (1966); *Pacific Ins. Co. of New York v. Frank*, Okl., 452 P.2d 794 (1969); *West Edmond Hunton Lime Unit v. Lillard*, Okl., 265 P.2d 730 (1954).

12. *Vermont Food Industries, Inc. v. Ralston Purina Co.*, (C.A.2d Cir.), 514 F.2d 456 (1975); *Vlases v. Montgomery Ward & Company*, (C.A.3rd Cir.), 377 F.2d 846 (1967); *Eichenberger v. Wilhelm*, N.D., 244 N.W.2d 691 (1976); *Controltek, Inc. v. Kwikee Enterprises, Inc.*, 284 Or. 123, 585 P.2d 670 (1978).

13. *Hampton Guano Co. v. Hill Live-Stock Co.*, 168 N.C. 442, 84 S.E. 774. See also 81 L.Ed. 994 (1924).

14. *Wooten v. Motorola Communications & Elec., Inc.*, Okl., 488 P.2d 1284 (1971); *Rich's Restaurant v. McFann Enterprises, Inc.*, Colo., 570 P.2d 1305 (1977).

15. 93 A.L.R.3d 363, 372, 375; 17 A.L.R.3d 1010, 1111. See also Uniform Commercial Code Comment No. 4 to § 2–607.

16. In accord, see: *Larrance Tank Corporation v. Burrough*, Okl., 476 P. 346 (1970); *Rich's Restaurant v. McFann Enterprises, Inc.*, Colo., 570 P.2d 1305 (1977); *MacGregor v. McReki, Inc.*, 30 Colo.App. 196, 494 P.2d 1297 (1970); *Jeffries v. Clark's Restaurant Enterprises*, 20 Wash.App. 428, 580 P.2d 1103; *Kasey v. Suburban Gas Heat v. Kennewick, Inc.*, 60 Wash.2d 468, 374 P.2d 549 (1962); *Jarstad v. Takoma Outdoor Recreation, Inc.*, 10 Wash.App. 551, 519 P.2d 278 (1974); 67 Am.Jur.2d Sales, § 730, 41 A.L.R.2d 812, 825; 53 A.L.R.2d 270.

What constitutes notice within a reasonable time must necessarily vary with the facts and circumstances of each case.[17]

In the case before us, the elapsed time of twelve days from the date of the discovery by defendant of the defect in the product and the giving notice thereof to the plaintiff did not under the facts and circumstances of this case constitute untimely notice. "Discovery" that the fertilizer was not working was not a sudden event whose arrival could be anticipated or commemorated by the stroke of a clock. Rather, it was a gradual realization predicated upon day to day observation which when taking into account weather conditions and past experience with fertilizer led to the conclusion that the fertilizer was not performing in the manner reasonably to be expected.

Finally, plaintiff alleges that the remarks from the bench of the trial judge made upon rendering judgment indicated bias and prejudice on the part of the judge. The language involved was:

"I think when you hire someone to do something and it's not done or the results do not come about as forecast, be it implied warranty breach or be it no fertilizer was put down, that you have violated that person's rights." And, "I grew up on a farm and we applied fertilizer and got results every time, one way or the other."

Under the evidence in the case at bar, we find that the trial court's observations were fair and reasonable inferences and conclusions to be drawn therefrom, and that the same do not constitute reversible error.[18]

Defendant's motion for additional attorney fees for services on appeal is authorized to be presented to the trial court.

The judgment of the trial court is affirmed, however the cause is remanded to that court for consideration of defendant's motion for additional attorney fees.

IRWIN, C. J., BARNES, V. C. J., and HODGES, SIMMS, HARGRAVE and OPALA, JJ., concur.

17. 17 A.L.R.3d 1010, 1112; 93 A.L.R.3d 363, 387; 41 A.L.R.2d 812.

18. *Moses v. Miller*, Okl., 268 P.2d 900 (1954).